[Cite as *Diller v. Miami Valley Hosp.*, 2017-Ohio-9051.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| NOELLE DILLER | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO.   27342 |
| | : | |
| v. | : | T.C. NO. 16-CV-38 |
| | : | |
| MIAMI VALLEY HOSPITAL | : | (Civil Appeal from |
| | : |   Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 15th day of December, 2017.

. . . . . . . . . . .

DAVID M. DUWEL, Atty. Reg. No. 0029583, 130 W. 2nd Street, Suite 2101, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellant

KAREN T. DUNLEVEY, Atty. Reg. No. 0067056, 70 Birch Alley, Suite 240, Dayton, Ohio 45440
        Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the November 14, 2016 Notice of Appeal of Noelle Diller.  Diller appeals from the trial court's "Decision, Order and Entry Sustaining Defendant's Motion to Strike Exhibits to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment and Sustaining Defendant's Motion for Summary

Judgment." We hereby affirm the judgment of the trial court.

{¶ 2} Diller filed a Complaint against Miami Valley Hospital ("MVH") on January 5, 2016, alleging "wrongful discrimination for sex discrimination, sexual harassment and retaliation predicated on violations of Sections 4112.02 and 4112.99 of the Ohio Revised Code." The Complaint provides that Diller "began her employment with Defendant MVH in September 2007 as a uniformed officer. In 2012 she was promoted to the position of Parking and Information Systems Security Manager." Diller alleged that she "performed her job in a very satisfactory manner and always received very favorable performance reviews." According to the Complaint, around July 2014, MVH "hired Franklin Davidson as its Director of Campus Police," and Davidson became Diller's supervisor. Shortly after he was hired, Davidson "began to engage in actions believed by [Diller] to constitute sex discrimination and sexual harassment," such as "offensive and inappropriate comments that were sexually charged," according to Diller. The Complaint asserts that Diller reported Davidson's "unlawful conduct to [MVH's] senior management."

{¶ 3} The Complaint asserts that Diller was instructed to observe Davidson and "to continue to bring any concerns forward." Diller alleged that she "learned of a potential sexual harassment incident involving Davidson and a female employee of [MVH] and began to investigate same so she could report back to management." According to the Complaint, once MVH discovered that Diller was investigating "this sexual harassment incident, Davidson and [MVH] began to falsely accuse [Diller] of workplace infractions which eventually lead to her wrongful termination on February 19, 2015."

{¶ 4} MVH answered the Complaint on February 4, 2016, and on September 6, 2016, it filed "Defendant's Motion for Summary Judgment." MVH asserted in its motion

that in the course of her employment, Diller reported to Davidson and Jeff James, the Director of Facility Services, and that she was terminated "for compromising the Hospital's security system by reprogramming a security camera for purposes of trying to catch Davidson spending too much time at the Information Desk." According to MVH, "Diller claims that she received an anonymous voicemail message from an unidentified caller who expressed a concern about the amount of time that Davidson was spending at the Information Desk near the employee entrance to the Hospital." MVH argued that Diller "took it upon herself to commandeer the Hospital's security surveillance system to try to catch [Davidson] in the act." Citing Diller's attached deposition, MVH asserted that "Diller was very clear in her testimony that she did not suspect that Davidson was engaging in any misconduct aside from wasting time at the Information Desk. Specifically, she testified that she was not investigating possible sexual harassment by Davidson." MVH asserted that the "alleged anonymous voicemail was never mentioned even when she was confronted about reprogramming the camera, in her statement provided to Human Resources in response to her suspension, or in her lawsuit."

{¶ 5} MVH argued that the camera at issue, "Camera 304," a "Pan Tilt Zoom" device, was in place "to monitor and record activities within the interior employee entrance" to the hospital and lobby area, which includes the Information Desk. MVH asserted that authorized security personnel could move the camera by means of a joystick to focus on specific areas within the camera's range. According to MVH, vagrants commonly loiter near the employee entrance, and the camera "was a critical component of the Hospital's surveillance system." MVH argued that Camera 304 was programmed with a "Home" setting, by means of which the camera would always return,

after a short period of time, to focus on the employee entrance. The "Home" setting "was intended to protect the Hospital's employees entering and leaving work, especially given the known presence of vagrants in that area."

**{¶ 6}** According to MVH, "on January 28, 2015, Diller entered the Security Dispatch [O]ffice and informed the two Dispatchers on duty (Tim Ahrns and Angela Cupp) that she wanted to reposition Camera 304 to focus on the Information Desk," to see if she could catch Davidson "hanging around" there. MVH asserted that Diller "disengaged/unlocked the camera's 'Home' Setting and then used the joystick to move the camera to focus on the Information Desk." MVH argued that Ahrns and Cupp discussed Diller's actions and were uncomfortable with her moving the camera. According to MVH, "Cupp commented that she did not want to be part of Diller's 'petty vendetta' against Davidson," and shortly after Diller left the Security Dispatch Office, Ahrns returned the camera's focus to the employee entrance. The following morning, according to the motion, Diller discovered that the camera's focus had been returned to the employee entrance five minutes after she moved it to the Information Desk the previous afternoon. MVH asserted that Diller advised Ahrns that Ahrns "could move Camera 304 wherever he wanted it," and that Ahrns worked a half day on January 29, 2015 and then was off work until February 3, 2015.

**{¶ 7}** According to MVH, between January 29 and February 3, 2015, "Diller asked Eric Gagnon (an employee of IPS – one of the Hospital's IT vendors) to go back into the Dispatch Office for her and reprogram Camera 304 to focus on the Information Desk AND to set that as the camera's new 'Home' setting." MVH asserted that Gagnon did so, and when Ahrns returned to work, he discovered that the camera had been "Homed" on the

Information Desk. On February 4, 2015, according to MVH, Ahrns asked Diller about the repositioned camera, and she told him that "she would look into it." MVH asserted that on the same day, "Ahrns reported Diller's actions to Corporal Brad Goudy and Sargent [sic] Benjamin Mason of the Hospital's Campus Police Department." MVH asserted that on February 5, 2015, Diller "reprogrammed Camera 304 back to its original 'Home' setting, focused on the employee entrance, where it belonged."

{¶ 8} According to MVH, Diller was suspended on February 6, 2015 "pending an investigation into the reprogramming of the security camera." MVH asserted that "Human Resources and the Security Department conducted an investigation and obtained statements from all witnesses, including Diller. * * * The statement by Diller contradicts her sworn deposition testimony in many respects." MVH asserted that Diller "fails to acknowledge (and implicitly denies) that she did, in fact, move the camera in an attempt to view Davidson at the Information Desk," but that she admitted doing so in her deposition. Further, MVH asserted, in her initial statement Diller claimed that she told Gagnon that she did not want the camera focused on the Information Desk, but in her deposition she admitted that was a false statement. Finally, MVH asserted that Diller was terminated on February 19, 2015 "for compromising the Hospital's security camera surveillance system."

{¶ 9} Regarding Diller's sexual harassment claim, MVH notes that in her deposition, "Diller recounts a story when she was helping Davidson with a computer issue. He was seated at his desk and she was standing behind him to visualize his computer monitor while on the phone with the Help Desk for him. He recited a famous quote, 'Behind every good man is a good woman.' " MVH asserted that the remark "was

an acknowledgment of her superiority with the issue at hand and his need for help from her. * * * No reasonable jury would find this statement to be offensive or sexual in nature."

{¶ 10} According to MVH, the "second comment that Diller claims was offensive was one that she initially said to Davidson and he merely repeated. The two were talking one day and Diller commented about how she needed to 'just pull up my big girl panties.' * * * Davidson apparently adopted her use of the phrase and repeated it on a few occasions." MVH asserted that "no reasonable juror would have found the use of this phrase to be offensive in this context."

{¶ 11} Finally, MVH asserts that the "only other behavior by Davidson that Diller claims to be harassing is that he raised his eyebrows (which she referred to as 'Google eyes'), while asking 'hey, how are you?' Beyond that, Diller states that Davidson was 'demeaning' to employees. Diller testified that Davidson's demeaning behavior was directed to everyone in the office." According to MVH, "Diller is simply incapable of producing sufficient evidence to create a genuine issue of material fact that Davidson's conduct was either sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or that it was 'based on sex.' "

{¶ 12} Regarding Diller's retaliation claim, MVH asserted that Diller "is unable to offer evidence to establish a *prima facie* case. First, Diller cannot offer any evidence that she engaged in protected activity." According to MVH, "Diller's retaliation claim appears to be based upon two alleged protected activities: (1) her report of inappropriate actions by Davidson to [MVH's] senior management * * * and (2) her investigation into the amount of time Davidson was spending at the Information Desk." MVH asserted that neither of these activities "constitute protected activity under R.C. §4112.02(I)."

{¶ 13} MVH asserted that in September, 2014, MVH's Chief Operating Officer, Mikki Clancy, "solicited feedback from the Security Department regarding Davidson as part of his 90-day evaluation. Diller responded with critical opinions of Davidson, which are set forth in a collection of emails to Clancy. * * * Diller described Davidson as pompous, demeaning, unknowing, and disrespectful." MVH asserted that Diller indicated that "male coworkers also expressed similar concerns about Davidson. * * * Diller provided Clancy with examples, including the 'behind every good man is a good woman' incident. She did not, however, tell Clancy about Davidson's reuse of her term 'Big Girl Panties.' " According to MVH, "Diller did not describe anything that could even arguably be considered to be sexual harassment or unlawful discrimination – either in her emails to Clancy or in her deposition testimony."

{¶ 14} MVH argued that the "focus of Diller's retaliation claim is found in her allegation that she was retaliated against for investigating Davidson. * * * In order for an investigation to be considered protected activity, however, the investigation had to relate to conduct that arguably violated R.C. §4112." MVH asserted that "Diller's rogue investigation had nothing at all to do with any even arguable discrimination or unlawful harassment."

{¶ 15} MVH asserted that Diller's deposition testimony does not support the allegations in her Complaint. MVH argued that while in her Complaint, Diller asserted that she was terminated in retaliation for investigating a potential sexual harassment incident involving Davidson, in her deposition, she indicated that she was investigating "whether Davidson was spending too much time at the Information Desk," and she denied that she was investigating sexual harassment. MVH asserted that to prove her

retaliation claim, "Diller must show that she was acting in opposition to an unlawful discriminatory practice," and that spending "too much time at the Information Desk is neither discriminatory nor unlawful."

{¶ 16} MVH asserted that even "if Diller's investigation could somehow be considered 'protected activity,' she cannot establish the second required element of a *prima facie* case – that the defendant knew of her protected activity. Diller testified that she did not tell anyone in management at the Hospital that she was investigating Davidson." MVH argued that Diller's written statement at the time of her suspension "says nothing about any investigation or any concerns involving Davidson."

{¶ 17} MVH further asserted that even "if Diller were able to establish a *prima facie* case of retaliation, the Hospital had a legitimate non-retaliatory reason for terminating her, and that reason is not susceptible to a pretext challenge. Diller was terminated for compromising the Hospital's security camera surveillance system." MVH argued that although she "lied about it in the written statement she submitted at the time of her suspension, Diller now admits to everything." MVH argued that "Diller also admits that she did not even consider whether her actions in reprogramming the camera could undermine the Hospital's security systems. The Hospital was fully justified in terminating Diller for this reckless behavior."

{¶ 18} Finally, MVH argued that Diller cannot establish that its reason for terminating her has no basis in fact, since she admitted reprogramming the camera, and that she "can offer no evidence that something else actually motivated the decision to terminate her." MVH asserted that "in order to prove that the grounds for her termination were insufficient to warrant termination, she would need to offer evidence that other

similarly-situated employees engaged in similar misconduct but were not terminated. No such evidence exists."

{¶ 19} Portions of Diller's deposition are attached to the motion for summary judgment, along with two exhibits thereto. Exhibit 1 is email correspondence between Diller and Mikki Clancy regarding Davidson's conduct, and Exhibit 2 is Diller's February 9, 2015 written statement that she provided to human resources upon her suspension. Also attached is the affidavit of Dispatcher Tim Ahrns, which provides as follows:

> * * *
>
> 3) Late afternoon on January 28, 2015, Noelle Diller entered the Security Dispatch office and informed me and Angela that she wanted to reposition Camera 304 to focus on the Information Desk. Noelle told us that she wanted to see if she could catch Campus Police Chief Franklin Davidson hanging around the Information Desk.
>
> 4) Camera 304 had [been] programmed with a "Home" setting focused on the employee entrance to the Hospital. This "Home" setting was intended to protect the Hospital employees entering and leaving work, especially given the known presence of vagrants in that area.
>
> 5) Noelle disengaged/unlocked Camera 304's "Home" setting and used the joystick to move the camera to focus on the Information Desk.
>
> 6) When Diller left the Dispatch office, Angela and I discussed that we were both very uncomfortable with Noelle moving the camera away from its "Home" setting focused on the employee entrance. * * *
>
> 7) Shortly after Noelle left, I moved Camera 304 away from the

Information Desk and re-focused it back to the employee entrance where it belonged. Since Noelle had disengaged the "Home" setting, the camera would remain focused on the employee entrance, where it belonged, until someone moved it again. The Security Dispatchers did not have the ability to change the "Home" setting on the camera.

8) I worked a half day on January 29, 2015 and was then off work until February 3, 2015. Noelle called me the morning of January 29th and told me that I could move Camera 304 wherever I wanted it.

9) When I returned to work on February 3, 2015, I discovered that Camera 304 had been moved back to and, this time, "Homed" on the Information Desk.

10) That same day, I reported Noelle's actions to Corporal Brad Goudy and Sargent [sic] Benjamin Mason of the Hospital's Campus Police Department. Her actions were very concerning to me. In my opinion, Noelle had compromised the Hospital's security system by reprogramming the camera, especially in light of her stated reason for doing it.

{¶ 20} Finally, the affidavit of Bukari Miles, the Senior Human Resources Consultant for MVH, is attached to the motion for summary judgment. It provides as follows:

* * *

3) In my capacity as Senior Human Resources Consultant, I have had communications with Noelle Diller relative to Franklin Davidson. Although Ms. Diller criticized Chief Davidson's management style and

competence, at no time prior to her termination did Ms. Diller ever allege that Chief Davidson engaged in any conduct which could be construed as unlawful discrimination or sexual harassment.

4) In February, 2015, Tim Ahrns, a Dispatcher in the Hospital's Security Department, escalated concerns with Hospital management regarding Noelle Diller's activities vis-à-vis the Hospital's security camera surveillance system.

5) I assisted with conducting an investigation into the concerns raised regarding Ms. Diller's activities vis-à-vis the Hospital's security cameral surveillance system.

6) On February 19, 2015, Ms. Diller was terminated for compromising the Hospital's security camera surveillance system.

7) A true and accurate copy of the termination documentation is attached hereto as Exhibit 1.

**{¶ 21}** The attached "Corrective Action Form, Level 5: Discharge/ Termination," details Diller's actions in repositioning the camera, and Ahrns' report of her conduct to Mason, and it provides that Diller's conduct "has served as a major intentional breach in the security of MVH hospital through its Security Camera Surveillance System." The form further provides in part:

***Immediate termination infractions***

9. Corrective Action Policy; Engaging in activity detrimental to the operation of Premier [H]ealth or any of its affiliates.

12. Violation of hospital or departmental policies[.]

1S Deliberately making false statements against others.

**General conduct violations**

15. Violation of Department/unit or any organizational Policy or Protocol[.]

26. Abuse or mishandling of [P]remier [H]ealth financial resources (video security cameras)[.]

{¶ 22} On September 20, 2016, a "Memorandum in Opposition to Defendants' Motion for Summary Judgment" was filed. Therein Diller asserted that her duties at MVH included "re-positioning cameras for [MVH] and that there remained numerous cameras [where] [she] re-positioned the camera, thus there was no safety issues [sic]." According to Diller, after receiving an anonymous voicemail that Davidson was "spending a substantial amount of time with an unnamed female employee during work hours" at the Information Desk, she chose to investigate whether inappropriate behavior was occurring before reporting that Davidson's behavior was inappropriate. Diller stated that she acted to "protect the hospital's employees and patients." She stated that she asked for the camera to be repositioned, and noticed that on the following day, it had had been "moved away from her desired location and actually homed to an entirely different viewing area." Diller stated that she then asked Eric Gagnon to "reprogram the camera to where she originally requested Tim [Ahrns] to reposition the camera."

{¶ 23} Diller argued that she testified the repositioning of the camera did not create a safety issue because an employee badge was required to access the area where the camera was located. Diller asserted that she further testified that "there are at least 14 cameras, include[ing] another pan-tilt-zoom camera that was able to view this area." According to Diller, she "capably testified that she had added a home setting to a PTZ

camera no less than twenty times during her employment with" MVH. Diller argued that "within only one week that [Davidson] became aware that [she] was attempting to spy on his lengthy visits to the Information Desk, [she] was terminated. [MVH], and especially Davidson, was aware that [Diller] believed that Davidson was doing something improper."

{¶ 24} Regarding her sexual harassment claim, Diller argued that Davidson's harassment was "so unwelcome" to her that she sought intervention from Bukari Miles, Senior Human Resources Consultant for MVH. Diller argued that Miles denied that she did so in his affidavit, and that "this is a rather large question of fact for the jury to consider." Diller asserted that she emailed Mikki Clancy on September 22, 2014, stating that "her relationship with Davidson feels 'very volatile and [a] hostile work environment.' " According to Diller, "Davidson was allowed to continue his disparate treatment of [her] as acquiesced by Miles and Clancy."

{¶ 25} Diller argued that Davidson's "nothing like a good woman standing behind a good man" statement was not a compliment, and that it "was more than likely a sexual innuendo implying that he enjoyed [her] being close to him in the work environment * * *." According to Diller, her "big girl panties" remark for her "meant to step up her game, [and] for Davidson, it was likely just a way for him to use the term panties and [Diller] in the same sentence." Diller argued that Davidson additionally "would make google (googly) eyes at her," and that he refused to call her by name, "instead using nicknames that he alone thought appropriate." According to Diller, she testified regarding another incident "where, prior to a meeting regarding the placement of access card readers and security options for the placement of cameras on a new floor of the hospital, [Diller] was told to keep her mouth shut and take notes for Davidson." She argued that Davidson

demeaned her in the meeting.

{¶ 26} Regarding her retaliation claim, Diller asserted that the manner in which her termination "was ultimately effectuated, together with the temporal circumstances surrounding such unlawful actions, smack of the retaliatory conduct prohibited under Ohio law." Diller asserted that she was asked by Mikki Clancy "to report on Davidson and the apparent hostile work environment that had occurred within the hospital since Davidson began his employment." Diller asserted that due to the "do nothing policy that the hospital was actively participating in regards to Davidson's treatment, [she] took notice of the voice mail she received and sought to see for herself if Davidson was in fact doing something improper at the information desk." Diller asserted that she did not disclose her investigation "because she did not want to falsely accuse her supervisor of wrongdoing. * * * But upon Davidson's knowledge that [Diller] was spying on him, Davidson quickly investigated the matter and had [her] terminated."

{¶ 27} Finally, Diller asserted that MVH has not demonstrated that repositioning the camera was not "under [her] duties, nor will it be able to show that anyone was in danger because of the repositioning." She asserts that MVH has not explained "why Davidson initially moved the camera away from the information desk, as it had always been." She argues that "retaliatory claims turn on the employer's reaction to * * * protected activity, and not on whether the employee correctly interpreted the workplace environment. Thus, whether it can be demonstrated that Davidson subjected [Diller] to lawfully recognized sexual harassment is irrelevant." Diller asserted that she "need only establish that she reasonably perceived such animus, attempted to address such belief and was terminated for doing so."

{¶ 28} Attached to the memorandum is Diller's complete deposition (Exhibit A); a February 11, 2015 document entitled "Meeting with Angela Cupp, Support Dispatcher for Campus Police," regarding "Review of Statement Submitted to Chief Franklin Davidson," (Exhibit B); an email exchange between Mikki Clancy and Diller regarding Davidson's conduct (Exhibit C); and a "Position Summary" for the Parking and Security Information Systems Specialist position (Exhibit D).

{¶ 29} On September 27, 2016, "Defendant's Motion to Strike Exhibits to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment" was filed. MVH asserted that Exhibits B, C, and D "are not proper evidence under Civil Rule 56 and should be stricken and not considered."

{¶ 30} On September 27, 2016, "Defendant's Reply Memorandum in Support of Motion for Summary Judgment" was filed. MVH argued that Diller's Memorandum in Opposition "is considerably different from the story told by [Diller] in her sworn deposition testimony." MVH asserted that in "her deposition, Diller adamantly denied that she was investigating possible sexual harassment," and "also denied that Mikki Clancy in any way authorized her to investigate Davidson's conduct." MVH argued that contrary to Diller's assertion in her memorandum, there "is no evidence before this Court that Davidson was in charge of the investigation or even participated [in] the decision to terminate Diller." MVH asserted that Bukari Miles "acknowledged his communications with Diller relative to Franklin Davidson." According to MVH, there "is no evidence that Davidson singled out Diller or even females generally." MVH argued that Diller's "lying to investigators is further justification for her termination." Regarding Diller's characterization of the "do nothing policy" at the hospital, MVH asserted that "the evidence shows that Diller was specifically

advised by Mikki Clancy that her criticisms of Davidson were being investigated by HR." MVH asserted that it is undisputed that a threat of violence existed at the employee entrance where Diller diverted the camera, "because it was a known refuge for vagrants." Finally, MVH argued that even "if Diller could reposition security cameras as part of her job duties, that certainly did not entitle her to manipulate the Hospital's IT vendor to commandeer the Hospital's security system to allow her to spy on her boss without interference from the Security Dispatchers."

{¶ 31} On October 3, 2016, a "Memorandum in Opposition to Defendant's Motion to Strike Exhibits to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment" was filed. Diller asserted that "the exhibits attached to its motion were provided by [MVH] during discovery in this matter and thus proper under Rule 56(C). [Diller] has attached Certification of Counsel as Exhibit A to affirm that the documents were served upon Plaintiff's counsel through discovery." The Certification of Counsel provides in part: "True and accurate copies of certain documents produced during the course of discovery * * * are set forth and identified herein below, which are materially relied upon in furtherance of Diller's opposition memorandum," citing Exhibits A, B, C, and D.

{¶ 32} In granting summary judgment in favor of MVH, the trial court noted that in her deposition, Diller "asserted that she was investigating whether Davidson was spending too much time at the Information Desk as suggested by an anonymous caller, but never stated that she was investigating a potential sexual harassment incident involving Davidson, as indicated *in her Complaint.*"

{¶ 33} Regarding MVH's motion to strike Diller's exhibits, the court concluded as

follows:

* * * Under Ohio law, documents merely attached to a summary judgment motion are not cognizable. The subject Exhibits do not fall within one of the categories of evidence listed in Civ.R. 56(C), namely pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, or written stipulations of fact, and, thus, those Exhibits can only be introduced as proper evidentiary material when incorporated by reference in a properly framed affidavit.

While Defendant submitted an affidavit, or Certification of Counsel, from David M. Duwel, the court fails to find that Duwel's affidavit concerning the Exhibits was sufficiently based upon personal knowledge or affirmatively showed Duwel to be competent to testify as to the matters stated and documents referenced therein. In his affidavit, Duwel failed to demonstrate that he possessed working knowledge of the specific record-keeping system that produced the documents or was able to vouch from personal knowledge of the record-keeping system that such records were kept in the regular course of business. Duwel failed to testify as to the regularity and reliability of the business activity involved in the creation of the records or that he was familiar with the compiling or retrieval of the records or that the records were compiled at or near the occurrence of each event by persons with knowledge of said events. Duwel also failed to state that he was able to compare the copy with the original and verify the copy is accurate, or explain why this could not be done. Furthermore, Duwel

failed to properly incorporate by reference by failing to attach the documents or other evidence to his affidavit. Therefore, Defendant's Motion to Strike as to Plaintiff's Exhibit B, C, and D is hereby **SUSTAINED**, and the same are hereby **STRICKEN**.

**{¶ 34}** Regarding Diller's claim of sexual harassment, the trial court concluded as follows:

In the instant action, [Diller] has not alleged a quid pro quo harassment claim, but, rather, has alleged that Davidson's conduct created a hostile work environment. The alleged harassment about which [Diller] complained consisted of the following occurrences: (1) an incident where Davidson stated, "nothing like a good woman behind a good man"; (2) uncounted incidents where, following [Diller's] reference to "just pull up my big girl panties," Davidson repeated the phrase; and (3) an incident where Davidson made "google" eyes at [Diller]. However, construing the evidence in a light most favorable to [Diller] and accepting [Diller's] allegations as true, the court finds that reasonable minds could only come to one conclusion regarding [Diller's] sexual harassment claim – that being adverse to [Diller] – and [MVH] is entitled to judgment as a matter of law. Here, while it is undisputed that Davidson's alleged statements and actions were unwelcome to [Diller], [Diller] failed to set forth evidence demonstrating that Davidson's comments were based on sex or were sufficiently severe or pervasive to affect [Diller's] employment. First, the testimonial evidence provided by [Diller] suggested that Davidson's "demeaning" behavior was

experienced by others in the department. Additionally, [Diller] was only able to recall a limited number of incidents where Davidson allegedly made comments that she believed were inappropriate, making the frequency of the comments very low. Additionally, there is no evidence that the comments were severe, as one comment referenced the saying, "Behind every good man is a good woman," and the comments referenced [Diller's] own statement regarding "to just pull up my big girl panties." There is also no evidence that any of the occasions were physically threatening or humiliating, and there is no evidence that Davidson's comments interfered with [Diller's] work performance. In other words, there is no evidence that the actions of Davidson were so severe or pervasive enough to create an objectively hostile work environment. Therefore, [MVH's] Motion for Summary Judgment as to Plaintiff's sexual discrimination/sexual harassment claim is **SUSTAINED.**

**{¶ 35}** Regarding Diller's claim of retaliation, the trial court found as follows:

Here, the basis of [Diller's] retaliation claim lies in her belief that she was terminated because she reported alleged inappropriate actions by Davidson to [MVH's] management and she was attempting to investigate the amount of time that Davidson was spending at the Information Desk. The evidence before the court demonstrates that [Diller] provided feedback to Mikki Clancy concerning her opinion regarding Davidson's integration in his new role and his general "demeaningness" to those in the department and that Clancy expressed gratitude for [Diller's] feedback in an email dated

October 1, 2014. [Diller] also stated that others within the department felt similarly about Davidson's "demeaning" interaction with staff members. While [Diller] asserted that she was investigating a "potential sexual harassment incident involving Davidson" in her Complaint, she denied that she was investigating Davidson for sexual harassment during her deposition and simply stated that she was investigating the amount of time that Davidson was spending at the Information Desk.

Still, there is no evidence that [Diller] told anyone in management at [MVH] that she was investigating Davidson. There is also no evidence that [Diller] ever notified [MVH] regarding Davidson's alleged sexual harassment of [Diller], including Davidson's statement, "nothing like a good woman behind a good man" or his reference to [Diller's] saying "to just pull up her big girl panties." Additionally, [MVH] set forth evidence that [Diller] was terminated for compromising [MVH's] security camera and leaving the employee entrance to the Hospital without security surveillance for an extended period of time. It is also undisputed that [Diller] knew that the camera had been positioned to focus on the employee entrance; that vagrants loitered at the entrance; and that the Dispatchers had moved the camera back to its "Home" setting focused on the entrance after [Diller] tried to move it the first time. It is also undisputed that [Diller] later requested IT to then reprogram the camera with a new "Home" setting focused on the Information Desk, even after the Dispatchers had moved it back to its original entrance position.

[Diller] argued that she could not be terminated for repositioning the subject camera, as repositioning cameras was allegedly part of her job duties, and, thus, [MVH's] reason for terminating [Diller] was merely pretext. Again, Plaintiff requested the Security Dispatchers to reposition the camera to view the Information Desk instead of the entrance, where the subject camera had been fixed to "Home." Later, the Dispatchers decided that they were not comfortable with this maneuver, and moved the camera back to its original position on the hospital entrance. Once [Diller] discovered that the camera was back to its "Home" setting, which the Dispatchers did not have the ability to change, [Diller] instructed [MVH's] IT vendor to go to the Dispatch Office and reprogram the camera with a new "Home" setting on the Information Desk instead of the Hospital's entrance. When the Dispatchers discovered this camera change, Ahrns reported [Diller's] conduct; and investigation ensued; and [Diller] was terminated. There is no evidence that [Diller] had the authority within her job duties for her conduct in the circumstances in this case.

Based on the foregoing, and even construing the evidence in favor of [Diller], the court finds that reasonable minds could only come to one conclusion regarding [Diller's] retaliation claim – that being adverse to [Diller] – and that [MVH] is entitled to judgment as a matter of law. First, there is no evidence that [Diller] engaged in a protected activity when she was repositioning the subject security camera to investigate Davidson's time spent at the Information Desk nor is there any evidence [MVH] knew

of [Diller's] investigation of Davidson. Second, even if [Diller] set forth evidence establishing a prima facie case for retaliation, [MVH] set forth non-retaliatory reasons for [Diller's] discharge, including that [Diller] was terminated for engaging in an activity deemed detrimental to the operation of [MVH], namely that [Diller's] repositioning of the entrance security camera compromised the security of the Hospital and the safety of its patrons; that [Diller's] actions violated hospital or departmental policies; that [Diller] made false statements against others; that [Diller's] actions violated organizational policies; and that [Diller] mishandled [MVH's] financial resources, namely the subject security camera. Finally, since [MVH] set forth evidence of a legitimate non-retaliatory reason for terminating [Diller], [Diller] was required to set forth evidence demonstrating that [MVH's] reason was merely pretext, which she failed to do. Therefore, [MVH's] Motion for Summary Judgment as to [Diller's] retaliation claim is hereby **SUSTAINED.**

{¶ 36} Diller asserts three assignment of error herein. Her first assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT DISMISSED APPELLANT'S SEXUAL HARASSMENT CLAIM.

{¶ 37} As this Court has previously noted:

Summary judgment may not be granted unless the entire record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Civ.R. 56. The

burden of showing that no genuine issue of material fact exists is on the moving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 375 N.E.2d 46.

All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made. *Morris v. First National Bank & Trust Co.* (1970), 21 Ohio St.2d 25, 254 N.E.2d 683. "Because a trial court's determination of summary judgment concerns a question of law, we apply the same standard as the trial court in our review of its disposition of the motion; in other words, our review is *de novo.*" *Am. States Ins. Co. v. Guillermin* (1996), 108 Ohio App.3d 547, 552, 671 N.E.2d 317.

R.C. 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." "A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination 'because of * * * sex' by proving either of two types of sexual harassment: (1) 'quid pro quo' harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) 'hostile environment' harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 176, 729 N.E.2d 726.

*Harmon v. GZK, Inc.,* 2d Dist. Montgomery No. 18672, 2002 WL 191598, *4-5 (Feb. 8, 2002).

**{¶ 38}** As the trial court noted, Diller's complaint alleged "hostile environment" sexual harassment. As this Court further noted in *Harmon*, at *5:

> * * * "In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Id.* [citing *Hampel* at 176-77.]

> In *Hampel*, the court noted that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Id.* at 175, 729 N.E.2d 726.

**{¶ 39}** "In *Hampel*, the supreme court noted that 'any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment.' " *Hale v. City of Dayton*, 2d Dist. Montgomery No. 18800, 2002 WL 191588, * 3 (Feb. 8, 2002).

{¶ 40} As this Court previously noted, under the third element, "[w]e must consider the totality of the circumstances: '[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Hale,* *3-4, quoting *Hampel*, at 180. "Furthermore, the severity and pervasiveness are to be looked at together so that 'deficiencies in the strength of one factor may be made up by the strength in the other.' [*Hampel* at 181]. * * *." *Hale*, *4. "* * * [T]he harassing conduct 'must be severe or pervasive enough to create both an objectively hostile or abusive work environment – one that a reasonable person would find hostile or abusive – and a subjectively hostile work environment – one that the victim perceived to be hostile or abusive.' * * *." *Id.*

{¶ 41} As this Court further noted in *Hale,* *4:

* * * In looking at when harassment becomes severe and pervasive enough to affect the terms and conditions of employment, courts have set a high bar. Courts have repeatedly held that isolated incidents, unless *extremely* serious, do not constitute a hostile work environment. See, *e.g.*, *Faragher v. City of Boca Raton* (1998), 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (stating that " 'simple teasing,' * * * offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' "); *Morris v. Oldham Cty. Fiscal Court* (C.A. 6, 2000), 201 F.3d 784, 790; * * *. * * * Courts have generally only found isolated incidents to

create a hostile work environment where they involve some form of sexual assault or touching. See, *e.g.*, *Morris, supra* (holding that conduct was not severe or pervasive where co-worker told several dirty jokes in plaintiff's presence, made one verbal sexual advance related to plaintiff's evaluation, referred to plaintiff once as "Hot Lips," and made comments about plaintiff's dress); *Brooks v. City of San Mateo* (C.A.9, 2000), 229 F.3d 917, 924 (holding that a single incident of fondling was not severe and pervasive); *Tatum v. Hyatt Corp.* (D.D.C. 1994), 918 F.Supp. 5, 7 (holding that conduct was not severe and pervasive where co-worker wrapped his arms around the plaintiff, rubbed against her to simulate sex, commented on her looks, and put a piece of ice down her shirt). But, see, *Little v. Windemere Relocation, Inc.* (C.A. 9, 2001), 265 F.3d 903, 911 (holding an incident in which a [business client] raped plaintiff three times was severe), [*opinion amended and superseded*, 301 F.3d 958 (C.A. 9, 2002)]; *Guess v. Bethlehem Steel Corp.* (C.A. 7, 1990), 913 F.2d 463, 464 (holding that a single incident in which plaintiff's supervisor forced her face against his crotch was severe). * * *

**{¶ 42}** Diller's deposition testimony reflects the following exchange:

Q. You had previously indicated that you had talked to HR about issues you were having with the chief, correct?

A. That's correct.

* * *

Q. What was the nature of the concerns that you had addressed

with HR?

A.   The volatile work environment, the demeaning tone of which everything was [sic], and also the inappropriate sexual - - inappropriate sexual comments that he made to me.

Q.   And tell me about the inappropriate sexual comment.

A.   I was in his office, it was early in the morning, he had come into work and he was trying to log onto his computer and he couldn't get it to open up.   He couldn't remember his password, so I called IT from his desk, the help desk.   I went behind his desk to use his phone because his computer was here, his phone was here, his chair was here, and there was a front desk - - he had, like an L-shaped desk - - he was sitting in his chair and I walked behind his chair to his phone.   I was back there viewing his computer, and I picked up the phone, called the help desk and while I'm on hold waiting for them to answer, he was sitting like this and he turns and he looks at me and he gives me this weird, like, strange look and I was like what, and he said nothing like a good woman behind a good man.   At that point IT came on the phone and I said hang on one quick second, Franklin Davidson needs you, and I handed the phone to him and I hurriedly walked out of his office.

Q.   Had he made any other, what you considered to be inappropriate sexual comments or gestures to you at any other point in time?

A.   You know, I made the comment one time about figuring this out

and growing up and trying to just pull up my big girl panties and every time that he would talk he would bring that up in general conversation, why don't you just pull up your big girl panties.

Q. But that was a term that you had used to him, right?

A. Well, in a conversation that we were having it was off the record, per se, but, yes, I had used that in a context and I didn't know it would be thrown at me every time that he then spoke to me.

Q. Did you tell him you didn't like him using that term?

A. I just said I thought it was inappropriate.

Q. Do you consider that to be somehow sexual?

A. He was very demeaning and very inappropriate, so from him, yes.

* * *

Q. * * * Then he made this pull up your big girl panties comment to you on a few occasions?

A. Yes.

Q. Anything else that you considered to be sexual harassment?

A. He would look at me in google eyes, just inappropriate.

Q. Well, you have to be more specific. What do you mean by google eyes?

A. You know, he would just come in and he would be like, hey, how are you, and just - -

Q. He would raise his eyebrows when he spoke to you?

A. Yes.

Q. Anything else?

A. Not that I can think of off the top of my head.

* * *

Q. * * * Did you discuss your concerns with the chief's management style with any of your coworkers?

A. Yes. I think it was common knowledge across the police officers, everyone in our office kind of felt the same way.

When asked if she was investigating a sexual harassment incident involving Davidson and a female employee, Diller responded, "No, ma'am."

{¶ 43} Construing the evidence most strongly in favor of Diller, and considering the totality of the circumstances, we conclude that while Diller makes clear that Davidson's conduct was unwelcome, she fails to establish that Davidson's remarks or actions were based on sex or so severe or pervasive as to affect her employment. She testified that Davidson's management style was "common knowledge across the police officers, everyone in our office felt the same way" about Davidson's conduct. In other words, according to Diller, Davidson's conduct was demeaning to all employees and not just her. Further, the comment, "nothing like a good woman behind a good man," contains no sexual content, and even if we were to construe the remark as somehow sexual, Diller's testimony makes clear that it occurred in a brief, isolated incident, in an offhand manner, before Diller left Davidson's office, and we cannot conclude that it was "*extremely* serious." The remark "why don't you just pull up your big girl panties" also contains no explicit sexual content, and while Diller alleges that Davidson said it repeatedly, we

conclude it is at most "a mere offensive utterance" that Diller acknowledges she herself used in Davidson's presence prior to Davidson using it. We cannot find that by looking at Diller "in google eyes" in the course of greeting her, this conduct somehow equates with a sexual connotation. Furthermore, she did not describe the glance(s) as frequent conduct, or threatening or intimidating. As the trial court noted, while Diller's Complaint provides that she "learned of a potential sexual harassment incident involving Davidson and a female employee," Diller clearly testified that she was not investigating Davidson for sexual harassment. Finally, nothing in Diller's testimony suggests that Davidson's conduct unreasonably interfered with Diller's work performance. There being no genuine issue of material fact regarding Diller's claim of hostile environment harassment, her first assigned error is overruled.

{¶ 44} Diller's second assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT DISMISSED APPELLANT'S RETALIATION CLAIM.

{¶ 45} R.C. 4112.02 provides:

It shall be an unlawful discriminatory practice: * * * (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person had made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

{¶ 46} As this Court recently noted:

* * * "[T]o prevail on a retaliation claim, a plaintiff must show that

retaliation is a determinative factor – not just a motivating factor – in the employer's decision to take adverse employment action." *Nebozuk v. Abercrombie & Fitch Co.*, 10th Dist. Franklin No. 13AP-591, 2014-Ohio-1600, ¶ 45. *See also Univ. of Texas Southwestern Med. Ctr. V. Nassar,* ___ U.S. ___, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013).

In retaliation claims under Title VII, 42 U.S.C. 2000e-3(a), which is analogous to R.C. 4112.02(I), the analysis is whether the protected conduct * * * was a determinative factor in the retaliatory conduct; in other types of discrimination claims, the standard is whether the protected conduct or classification was a "motivating factor" in an adverse employment action. *Nebozuk* at ¶ 45, citing *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, 997 N.E.2d 597, ¶ 59.

A plaintiff may prove a retaliation claim through either direct or circumstantial evidence. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008); *Nebozuk* at ¶ 39. When a plaintiff lacks direct evidence, he or she may establish retaliation through circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Imwalle* at 544; *Nebozuk* at ¶ 40..

Under the *McDonnell Douglas* framework, a plaintiff-employee bears the initial burden of establishing a prima facie case of retaliation. *Nebozuk* at ¶ 40, citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) and *Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of retaliation under R.C. 4112.02(I), an employee must establish the following: (1) she engaged in a protected activity; (2) her employer * * * knew of her participation in protected activity; (3) [the employer] engaged in retaliatory conduct; and (4) a causal link existed between the protected activity and the adverse action. *Nebozuk* at ¶ 40. The establishment of a prima facie case creates a presumption that the employer-defendant unlawfully retaliated against the employee-plaintiff. *Id.*

Once an employee establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate nondiscriminatory reason for" its action. *Id.* at ¶ 41, citing *Carney v. Cleveland Hts.-Univ. Hts. City School Dist.*, 143 Ohio App.3d 415, 429, 758 N.E.2d 234 (8th Dist. 2001) and *Burdine* at 252-53, 101 S.Ct. 1089. If the employer carries its burden, then the burden shifts back to the employee to prove that the employer's stated reason is a pretext for discrimination. *Id.* "An employer may make employment decisions 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.' " *Brown v. Renter's Choice, Inc.*, 55 F. Supp.2d 788, 795 (N.D. Ohio 1999), quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

*Little York Tavern v. Lane*, 2d Dist. Montgomery No. 27013, 2017-Ohio-850, ¶ 15-19.

{¶ 47} The following exchange occurred at Diller's deposition regarding her

termination:

Q. * * * What is your understanding of the reason for the termination of your employment?

A. For moving a camera at the lobby.

Q. Did you move the camera at the lobby?

A. I did.

Q. Tell me what happened.

A. I received a phone call, it was voice mail, from an anonymous number, and the call was anonymous. It just said that they were concerned with the amount of time that Franklin Davidson was spending with this female at this desk.

Q. What specifically did the caller say?

A. Just that.

* * *

Q. Did you report this call to anybody?

A. I did not.

Q. Why not?

A. Because I didn't want to overstep my bounds. I didn't want them to start asking questions before I had answers. There may have been no real reason to start anything yet.

* * *

Q. So what did you do after receiving that phone call?

A. I went up and moved the camera in dispatch and the next day I

went to look at the camera and it had been moved five minutes after I moved it by a dispatcher.

\* \* \*

Q. \* \* \* So this camera was a pan-tilt-zoom; what was its function before you changed it?

A. It had been moved to view the employee entrance and, again, I was not aware of that either.

Q. Well, when had it been moved to view the employee entrance?

A. At some point Franklin Davidson had instructed the dispatchers to have it moved there.

Q. Where had it been before that?

A. It always viewed the information desk and it could see that hallway right there, admissions - - that admissions desk because we always had vagrant people that would sit right there. There is a payphone there - - used to be - - and it would view that, as well as the chairs that were along that wall; we had it viewing those because vagrants would come in and sit there and act like they were there for a purpose.

{¶ 48} Diller stated that she was told that Davidson wanted the camera on the employee entrance by Dispatcher Ahrns. She stated that she told the dispatchers that she "needed to see the activity at that desk" on January 28, 2015. Diller testified that she "unlocked" the home position on the camera. Diller testified that she did not inform the dispatchers that she wanted to view Davidson at the desk. Diller stated, "I wanted to verify that what I was being told was truthful or not. If it wasn't truthful, then there was

nothing to take forward to Mikki." Diller stated that after she realized the camera had been moved again, she "went back and changed it back, and I don't even remember if it was that day or the next couple of days and it only sat there, I think - - I think I homed it to that position so that it could not be moved and it sat there less than forty-eight hours, I think, like thirty-six hours."

**{¶ 49}** Diller then testified that she asked Eric Gagnon to reposition the camera for her after she discovered that its focus had been returned to the employee entrance. She stated that she told him that she wanted to monitor the information desk, and that she did not tell him that she wanted to monitor Davidson. Diller testified that she was suspended on a Friday, and that she submitted her written statement to human resources the following Monday. The following exchange occurred:

Q. Do you recall telling human resources that you had specifically instructed Eric to move the home location away from the information desk?

A. I don't remember. No.

Q. Well, that's the exact opposite of what you've been telling me, correct?

A. Right.

Q. He - - you told him that you wanted it to focus on the information desk, correct?

A. Correct.

Q. * * * So you would not have told human resources that you instructed him to move it away from the information desk, correct?

A. I don't think so.

Q. Well, that would've been a false statement, right?

A. Right.

**{¶ 50}** Diller stated that prior to asking Gagnon to change the home setting on the camera that she added home settings to other cameras "[n]o less than twenty times." Diller stated that she did not consider whether her conduct could undermine MVH's security system or jeopardize employee or patient safety "because it did not."

**{¶ 51}** The following exchange occurred:

Q. Do you think there's anything inappropriate about what you did considering that the reason for doing it was to catch your boss doing something wrong?

A. I wasn't trying to catch him doing anything wrong; I was trying to find out if someone's accusation was correct or false.

Q. And that's trying to find out whether he was doing something wrong, correct?

A. It's an investigation.

Q. * * * An investigation that you have no authority to conduct, correct?

A. Those are my cameras and so I was able to move those cameras to that position, yes.

Q. What is the proper protocol for an employee if there is a complaint with respect to inappropriate conduct by an employee, to whom are you supposed to report that?

A. I don't know.

Q. Human resources, what is human resources' function to your knowledge?

A. Human resources is there for the employee and I had been to human resources and nothing was being done.

{¶ 52} The following further exchange occurred regarding the camera:

Q. Did you ever personally change the home setting on that camera?

A. Yes.

Q. When did you do that?

A. I've done that multiple times throughout my employment.

Q. Did you do it after you asked Eric to focus it on the information desk?

A. I don't recall.

Q. Did you change it back so that it was focused to where it was supposed to be focused, on the employee entrance?

A. Yes.

Q. When did you do that?

A. Like thirty-six hours after I moved it initially.

Q. Why did you do that?

A. Just because it needed to go back there, that's where he wanted it so that's where I put it.

Q. That's where who wanted it?

A. Franklin.

**{¶ 53}** Finally, the following exchange occurred regarding Diller's written statement:

Q. Let me hand you Exhibit 2. Is that the statement that you testified about earlier that you prepared after you were suspended?

A. Yes, and I was incorrect in what I had told you.

Q. About what?

A. I did ask Eric to get a view of that desk as well as the surrounding areas and he said that he couldn't get the camera position so then he said it was just the desk and that is when I told him to move that camera back to its original position, that's why it was moved. I apologize.

Q. Well, so did you tell Eric that you wanted the camera to be homed at the desk?

A. I wanted a view of that desk and its surrounding areas, yes, but - - yes, at the desk.

Q. Okay.

A. It used to have that view.

Q. Then according to this statement you then told HR that you - - that the next day you were told that it was not a good view, that it was sitting on the desk and I immediately told the tech I did not want it on the desk and he instructed me how to take it off a home position.

A. Correct.

Q. * * * That's totally different from what you testified to earlier, is it not?

A. I was inaccurate, yes.

**{¶ 54}** In addition to her testimony about investigating Davidson, Diller testified about reporting Davidson's conduct to Clancy. Diller testified that on one occasion, Davidson advised her to text him if she left the facility, that she texted him that day when she returned from picking up lunch, and that when he observed her in the kitchenette eating, "he said are you going to text me when you go to the bathroom, too." Diller stated that one day when she, Davidson and other coworkers were "walking the floor," Davidson advised her to "keep my mouth shut and let him do all of the talking," and that he directed her on taking notes. According to Diller, "it was in front of everyone - - it was very demeaning." Diller testified as follows:

He would never call me by my name. Instead of calling me Noelle he would call me Lenel, L-E-N-E-L, because that was our door access system, and once it got to be about six months or so I just laughed and said, sir, would you start calling me Noelle and not Lenel because if it doesn't stop you're going to owe me a candy bar every time you do it and so, you know, we kind of laughed about it and he was like, oh, I'm sorry, I'm really bad with names; but he walked by my office every day, I was one door down from him and my name was on my office door, so you know it was a matter of respect, and so he would not even call me by then, hey, could you come down here, he would say, hey, come down here. He would never call me by my name.

**{¶ 55}** Diller testified that she emailed her concerns to Mikki Clancy after Clancy requested input within Davidson's first 90 days of employment. Finally, the following

exchange occurred regarding Diller's communication with Clancy:

> Q. Let me hand you what is marked as Exhibit I. Do you recognize this document as an email exchange that you had with Mikki Clancy and then you forwarded it to your spouse?
>
> A. Yes.
>
> Q. * * * Aside from this document, did your provide Ms. Clancy with any other information in writing relating to your concerns about the chief?
>
> A. Not to my knowledge. I can't honestly remember whether I did or not.

{¶ 56} The email exchange reflects that on September 22, 2014, Diller emailed Clancy about Davidson, describing him as "pompous and demeaning." She advised Clancy about the incident where Davidson said, "nothing like a good woman standing behind a good man," as well as the bathroom comment after she texted Davidson that she had returned from lunch, and the comments made during the walkthrough of the surgery floor. She described "what feels to be a very volatile and hostile work environment." On October 1, 2014, Clancy sent Diller an email thanking her for sharing her concerns and stating, "I would like to touch base with you in five-six weeks to see if the coaching and mentoring is improving the environment."

{¶ 57} Construing the evidence most strongly in favor of Diller, we conclude that MVH is entitled to summary judgment as a matter of law. There is no evidence in the record that Diller's conduct in investigating Davidson was protected activity or that MVH management was aware that Diller was engaged in any protected activity. Diller specifically denied in her deposition that she was investigating Davidson for sexual

harassment. Diller's testimony that she was investigating Davidson for the amount of time he spent at the desk, and not for sexual harassment, is consistent with Miles' affidavit that Diller never alleged that Davidson engaged in sexual harassment, and with Ahrns' affidavit stating that Diller wanted to catch Davison "hanging around" the desk. As MVH asserts, a "supervisor's wasting time at work is neither discriminatory nor unlawful."

{¶ 58} Further, Diller's complaints to Clancy do not indicate that she was objecting to unlawful discriminatory conduct based upon her sex. *See Balding-Margolis v. Cleveland Arcade,* 352 Fed.Appx. 35, 45 (6th Cir.2009) (holding that plaintiff did not engage in protected activity under Title VII or R.C. Chapter 4112, where she made "several complaints to * * * management concerning general work-related issues * * * but there is nothing in these complaints indicating that [plaintiff] was objecting to discriminatory conduct against her based on her membership in a protected class.")

{¶ 59} Finally, we cannot conclude that MVH terminated Diller for a discriminatory reason. Diller acknowledged the presence of vagrants by the hospital entrance that the hospital monitored, Ahrns and Miles averred that she compromised MVH's security system by diverting the camera, and her termination form provides nondiscriminatory reasons why she was terminated. For the foregoing reasons, Davidson's second assignment of error is overruled.

{¶ 60} Diller's third assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT SUSTAINED APPELLEE'S MOTION TO STRIKE THREE VITAL EXHIBITS.

{¶ 61} As noted above, Exhibit B is a summary of a meeting with Dispatcher Angela Cupp, Exhibit C is the email exchange between Diller and Clancy, and Exhibit D

is the "Position Summary" for Diller's former job. Diller asserts that "it seems disingenuous for [MVH] to assert that these documents are not authentic or properly identified, but in any event are hospital records and produced by [MVH]." According to Diller, "it was clear error to strike these exhibits, which were critical in demonstrating that Appellant had communicated with Mikki Clancy regarding Davidson making the statement that behind every good man is a good woman; an email from Andrea Tuttle advising why Diller was moving the cameras and her job description which clarified her responsibilities over the security camera system." MVH responds that the documents are business records that were not properly authenticated by Diller.

{¶ 62} "A trial court's decision to grant or overrule a motion to strike is within its sound discretion and will not be overturned on appeal absent a showing of abuse of discretion." *Kennedy v. Merck & Co., Inc.,* 2d Dist. Montgomery No. 19591, 2003-Ohio-3774, ¶ 42. As this Court has noted:

> * * * "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.,* 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 553 N.E.2d 597 (1990).

*Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

{¶ 63} Civ.R. 56 (C) provides in part that "Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact * * * show that there is

no genuine issue as to any material fact." Civ.R. 56(E) provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit."

{¶ 64} We find that the trial court erred in striking Diller's three exhibits. Counsel for Diller eventually attached an affidavit stating that the documents were supplied in discovery by MVH. Although the documents were not self-authenticating under Evid.R. 902, they were properly authenticated by testimony that they were documents that had been requested from and provided by the opposing party during discovery. *Stumpff v. Harris*, 2015-Ohio-1329, 31 N.E.3d 164, ¶ 32 (2d Dist.).

{¶ 65} This is not to say that everything produced in discovery should automatically be deemed to be impliedly or implicitly authenticated. *Id.*, ¶ 38. However, considering the totality of circumstances surrounding the documents' production, they should have been utilized by the court in ruling on the motion for summary judgment.

{¶ 66} However, we cannot find that the trial court erred in granting summary judgment, since the facts contained in the documents were either not in dispute, were otherwise part of the record, or were not relevant to the summary judgment decision. This assignment of error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

David M. Duwel
Karen T. Dunlevey

Hon. Mary Katherine Huffman