[Cite as *Lu v. Univ. of Dayton*, 2025-Ohio-1948.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| WEIJIE LU | : | |
| | : | |
| Appellant | : | C.A. Nos. 30272; 30375 |
| | : | |
| v. | : | Trial Court Case No. 2023 CV 01854 |
| | : | |
| UNIVERSITY OF DAYTON | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 30, 2025

. . . . . . . . . . .

WEIJIE LU, Appellant, Pro Se

BRIAN G. DERSHAW, Attorney for Appellee

. . . . . . . . . . . .

HANSEMAN, J.

{¶ 1} In these consolidated cases, Plaintiff-Appellant, Weijie Lu, appeals pro se

from a trial court judgment granting summary judgment to Defendant-Appellee, University

of Dayton ("UD"), and from the trial court's denial of Lu's motion for relief from judgment.

While Lu's brief fails to comply with appellate requirements and does not state

assignments of error, we interpret his brief to assert that the court erred in granting

summary judgment to UD and in denying the motion for relief from judgment.

{¶ 2} After reviewing the record, we conclude the trial court correctly granted summary judgment to UD. Lu failed to establish a prima facie case of retaliation under R.C. 4112.02(I). Moreover, UD presented legitimate, non-discriminatory reasons for rejecting Lu's employment application, and there was no evidence that UD's reasons were a pretext for unlawful discrimination.

{¶ 3} We further conclude that the trial court did not abuse its discretion in denying Lu's motion for relief from judgment. Lu failed to establish any of the requirements for relief under Civ.R. 60(B)(2) or (3). Accordingly, the judgments of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 4} In April 2023, Lu filed a complaint asserting that UD had refused to hire him for a full-time faculty position as an associate professor in the Department of Chemical and Materials Engineering ("CME") in retaliation for two charges of discrimination he had filed with the Ohio Civil Rights Commission ("OCRC") on January 5, 2021. After UD answered the complaint, Lu sought and received permission to file an amended complaint adding allegations he had included in a federal district court case that he intended to dismiss.

{¶ 5} The amended complaint filed in August 2023 added information about Lu's background and matters pertaining to a plagiarism charge he had made against a UD faculty member, Christoper Muratore. However, the complaint still contained only one

charge of retaliation, based on Lu's protected activity of filing the January 2021 charges with the OCRC. *See* Amended Complaint (Aug. 4, 2023), ¶ 67-72. After answering the amended complaint, UD filed a motion for summary judgment in November 2023. UD also filed various affidavits from its personnel, including members of the search committee that had considered Lu's employment application.

**{¶ 6}** In January 2024, Lu filed his memorandum in opposition to summary judgment and attached 25 exhibits covering various topics, including events that occurred many years earlier, his employment as a UD adjunct professor between 2014 and 2020, correspondence with the OCRC and UD, and so forth. Notably, the trial court case is not the first lawsuit Lu has filed against UD that involved the same general background.

**{¶ 7}** In April 2022, Lu filed a complaint in federal district court alleging that UD had committed race and national origin discrimination by not renewing his adjunct professor contract in the summer of 2020 and by failing to select him for a full-time professor's position in the UD Physics Department in February 2021. After the federal court granted summary judgment to UD on the federal claims and declined to exercise supplemental jurisdiction on the state law claim, Lu appealed to the Sixth Circuit Court of Appeals. That court affirmed the district court's judgment. *See Lu v. Univ. of Dayton*, 2023 WL 8187299, *1 and 3 (6th Cir. Nov. 27, 2023).

**{¶ 8}** As background, we note the Sixth Circuit's observations about the case:

Plaintiff Weijie Lu is an experienced physics teacher of Chinese descent. From 2014 to 2020, Lu taught introductory physics classes as an adjunct professor at the University of Dayton. However, the facts underlying

this case begin in 2012, prior to Lu's employment by Defendant, when Lu served as a technical advisor through the Air Force Research Laboratory ("AFRL") at the Wright Patterson Air Force Base. Dayton offers graduate students the opportunity to apply for the Defense Associated Graduate Student Innovators program ("DAGSI"), which is funded through the Ohio Department of Education and the United States Air Force. A Dayton graduate student, Sorrie Ceesay, participated in this fellowship program and worked on DAGSI-funded research under Lu's mentorship. For the majority of Lu's time serving as Ceesay's advisor at the AFRL, he was not employed as an adjunct professor at Dayton. Towards the end of his mentorship of Ceesay, Lu started working as an adjunct professor at Dayton in August 2014.

The AFRL terminated Lu in 2018. After his termination, he sent an e-mail to the Dayton [UD] Equity Compliance Office, stating, "I am an adjunct faculty in physics, and I lost my job and career at the Air Force Res Lab due to government corruption and discrimination . . . . Would you please [ ] educate me on the EEO laws .... (I have an attorney)." Bakota Aff., R. 8-1, Page ID #44. Amy Zavadil, the then-current Title IX Coordinator in the Equity Compliance Office at Dayton, replied and directed Lu to the local EEOC office. Nonetheless, Lu continued to reply, "seeking advice on [his] case with Air Force Res Lab." *Id.* Kimberly Bakota, a civil rights investigator at Dayton, subsequently replied in September 2018, also advising Lu to

contact the local field office and explaining that Dayton could not assist with a claim against the AFRL, as the two entities operated as separate institutions.

Then, during his time as an adjunct professor in 2019, Lu learned that his former mentee Ceesay was terminated from his research position with the AFRL because he was allegedly not a United States citizen when, in fact, Ceesay was a United States citizen. Believing such treatment was due to Ceesay's African-American race, Lu e-mailed Dayton on January 28, 2020, and expressed his concern regarding the AFRL's allegedly discriminatory acts. In relevant part, Lu claimed that "[t]he termination of Mr. Sorrie[ ] Ceesay was a typical Jim Crow civil rights violation and a constitutional violation, and it was at US Air Force in 2014." *Id.* at Page ID #47. Bakota once again replied that Dayton could not advise Lu or Ceesay on issues pertaining to discrimination claims against AFRL and directed him to the local field office of the EEOC. In addition to Bakota's reply, Scott Segalewitz, Associate Dean for Experiential Learning and Student Success, accidentally replied all and copied Lu, stating that "Mr. Lu just called and gave me an earful.... Good Luck, Paul." *Id.* These e-mails from Lu to various Dayton administrators regarding the alleged discrimination towards Ceesay occurred between January 28, 2020 and February 7, 2020.

About a month later, March 2020 marked the beginning of the COVID-19 pandemic. The adjunct professors, including Lu, were notified in

April that "[a]djuncts are currently under review by the Dean and the Provost" because of the uncertainty caused by the pandemic. Erdei Aff., R. 9-1, Page ID #60–61. The former chair of the Physics Department, John Erdei, e-mailed Lu about the undetermined future for adjuncts, stating: "I need you to know that the fall is now uncertain. Most certainly, if I learn anything I will certainly let you know." *Id.* at Page ID # 61. Erdei also followed up with Lu in June, advising him that fall adjunct contracts were still unsettled and explaining he may know more in July.

Concrete answers finally arrived in July 2020, and Lu was informed that a tenured professor would be teaching his previously assigned physics classes for the upcoming fall 2020 semester due to COVID-19 uncertainty and budgetary constraints. Dayton made the decision in summer 2020 to replace all Physics adjunct professors with tenured ones in order to minimize costs, as the tenured professors were already covered within the university's budget. Accordingly, a tenure-track professor, Ivan Sudakow, took over Lu's introductory physics class. Lu's loss of his adjunct teaching contract, while Dayton allegedly retained other similarly-situated temporary professors, forms the basis for his first adverse employment action allegation. Lu also believes that this first adverse employment action constituted retaliation for his report regarding the AFRL's discrimination towards Ceesay.

After Lu's adjunct professor contract was not renewed, Erdei

encouraged him to apply for a full-time professor position. As suggested, in February 2021, Lu applied for a professor position in Dayton's Electro-Optics and Photonics department. After reviewing about 40 applications, Lu's application was rejected in the initial screening phase along with 29 other candidates due to his "[w]eak research record." Sarangan Aff., R. 10-1, Page ID #70-71, 79. According to his application, Lu's last publication was over five years ago, and the position required "[a] very good record of refereed journal and conference publications," among other listed "Minimum Qualifications." *Id.* at Page ID #71, 74.

Lu disputes that he was unqualified and further claims that the candidate ultimately selected for the professor position did not meet the qualifications. Therefore, Lu also points to the search committee's failure to hire him as a second adverse employment action, highlighting that he is Chinese, while the successful candidate, Swapnajit Chakravarty, is Indian. Lu believes this ultimate employment decision was based on either national origin discrimination or was in retaliation for his discrimination complaint regarding Ceesay.

*Lu*, 2023 WL 8187299, at *1-2.

{¶ 9} Regarding the adjunct position, both the district court and court of appeals found that Lu could not make out a prima facie case that UD had discriminated by treating him differently than a similarly situated person outside his protected class. The district court's decision was based on the fact that, due to the COVID-19 epidemic, UD did not

hire any adjunct professors in the physics department, and the only other person employed was a visiting professor who was not in a similar position. The Sixth District's decision noted that "[r]egardless of whether an adjunct professor and a visiting professor are similarly situated, failure to point to facts indicating that the visiting professor was outside of Lu's protected class is fatal to his prima facie case for this portion of his Title VII discrimination claim." *Id.* at *6. The court stressed that Lu had made no attempt to establish this fact. *Id.* at *6 and fn. 5.

**{¶ 10}** Concerning the claim about the full-time Photonics position, the court of appeals found that Lu had failed to offer any evidence that he met the required criteria defined by the search committee's specific rubric, as "[n]ot only did Lu lack any publications within the past five years, but he also lacked any recent patents, as his last two patents were from 2004." *Id.* at *8. The court therefore found that Lu did not show he was objectively qualified for the position. *Id.*

**{¶ 11}** Concerning the retaliation claims, both courts assumed Lu had established a prima facie case but found he could not show pretext. *Id.* at *9. As to the adjunct job, the court of appeals stated: "Dayton proffered a legitimate, non-retaliatory reason by explaining that budgetary constraints and uncertainty imposed upon the university by COVID-19 caused the non-renewal of Lu's adjunct professor contract," and "Lu has not shown that these concerns were pretextual." *Id.* at *10. In this regard, the court stressed that "the record contains unrebutted evidence that Dayton terminated the contracts of all adjunct professors in the Physics Department, as well as the contracts of certain adjunct professors in other departments – not just Lu's or those who engaged in protected

activity." *Id.*

**{¶ 12}** In addition, the court noted the undisputed fact that Dr. Erdei (Lu's supervisor in the Physics Department) "was instructed to redistribute the adjunct faculty classes to tenured professors, out of respect for the ongoing budgetary fears. Because Erdei was instructed to redistribute courses, no ultimate budget approval was needed, as no adjunct contracts were issued." *Id.* The court of appeals further stressed that, "Following the non-renewal of Lu's contract, Erdei even offered to stay in touch with Lu after the fall 2020 semester and encouraged Lu to apply for a full-time job with the university – these are not the actions of an employer acting with a retaliatory motivation." *Id.*

**{¶ 13}** Regarding the retaliation claim about the Photonics faculty position, the court of appeals first noted that none of the members of the search committee had received Lu's e-mailed complaints about Ceesay and the AFRL program. Further, when the committee initially screened applicants, they were not aware of and did not discuss Lu's pending charge against Dayton or any OCRC case. *Id.* Therefore, Lu failed the second prong of a prima facie case of retaliation. *Id.* at *11. Finally, the court stated that even if it assumed otherwise, "Dayton has offered a legitimate, non-retaliatory reason for Lu's non-selection – he had no recent publications or patents. In fact, the selection committee's notes illustrate that they eliminated multiple candidates for '[w]eak research record[s].' " *Id.* Accordingly, the court of appeals affirmed the dismissal of Lu's discrimination and retaliation claims.

**{¶ 14}** This background also pertains to the events at issue here. As indicated, Lu's

current case was filed in April 2023 and is based on his April 2021 application for a full-time associate professor's position in the CME Department at UD. This was only a few months after Lu applied for the Photonics position. While the CME position involved a different department at UD, Lu made allegations in the amended complaint about his supervision of Ceesay in 2012-2013 when Ceesay was a student at UD, Lu's 2020 complaint to UD about its discrimination against Ceesay, who was African-American, UD's termination of Lu as an adjunct in 2020, and Lu's filing of a discrimination charge against UD with the OCRC on January 5, 2021. Amended Complaint at ¶ 36-39 and 53-56.

{¶ 15} Lu responded to UD's summary judgment motion on January 29, 2024, and UD replied on February 12. Before the court ruled on the summary judgment motion, Lu filed a pro se "Notice" on July 29; in response, UD asked the court to strike the 396-page document because Lu was represented by counsel. Lu filed another "Notice" on August 26, which was followed the next day by his counsel's motion to withdraw. On August 29, the court filed a decision granting UD's motion for summary judgment. The court also struck Lu's July 29 and August 26 Notices and, on August 30, it granted counsel's motion to withdraw. Lu then appealed from the decision on September 23 (Montgomery C.A. No. 30272).

{¶ 16} After Lu appealed, he filed a pro se motion for relief from judgment in the trial court on October 11, 2024. However, the court stayed the matter pending resolution of the appeal, based on lack of jurisdiction. *See* Order and Entry Staying Ruling on Plaintiff's Motion for Relief from Judgment (Oct. 17, 2024). At Lu's request, we remanded

the case so the trial court could issue a decision on the Civ.R. 60(B) motion. *See* Order Sustaining Motion to Remand (Nov. 1, 2024). Lu then filed a notice of remand with the trial court on November 8.

{¶ 17} Before filing this notice, Lu filed two supplements to his motion for relief from judgment – one on October 29 and the other on November 7. After remand, the court set submission dates, allowing UD to file an opposition memorandum by November 27, and permitting Lu to file a reply no later than December 2. Before UD had a chance to comply, Lu filed a third "supplement" to his motion on November 18. At that point, UD asked the court to deny Lu's motion for relief from judgment, to strike the motion and supplements from the record, and to award UD attorney fees and costs.

{¶ 18} Lu filed his reply, as directed, on December 2. He also included a motion asking the court to strike UD's memorandum and to sanction UD's attorneys. UD replied to that motion on December 5, and Lu then, on December 10, filed a "reply in opposition" to UD's reply. On December 30, the court denied Lu's motion for relief from judgment, denied both sides' motions to strike, and sua sponte struck Lu's October 29 and December 10, 2024 filings from the record. Lu timely filed a pro se appeal from the judgment in late January 2025 (Montgomery C.A. No. 30375). We consolidated the two appeals.

{¶ 19} Notably, we also sustained in part Lu's request to file a brief in excess of 25 pages. We ordered that Lu's brief could not exceed 35 pages, with some exclusions, like the cover page, table of contents, and the like. Order (Feb. 24, 2025). However, Lu's brief, while ostensibly 35 pages, is actually 50 pages (not including the properly excluded

pages). Specifically, Lu attached an "Appendix" to his brief that contains an additional 16 pages of further argument. Consequently, we will not consider that part of the brief (while noting it is repetitive of arguments made in the prior 35 pages).

{¶ 20} As an additional matter, while the case was on remand and after it had been returned following the decision on remand, Lu filed various pro se documents with our court, including: "Supplement 2 for Motion for Relief" (Nov. 7, 2024); Supplement 3 to Motion for Relief (Nov. 18, 2024); and "Submit Brief of Appeal" (Jan 27, 2025) (a 396-page document filed without leave for exceeding page limits). When we consolidated the two appeals, we ordered Lu to file an amended brief and stated that, when he did so, we would strike the brief filed on January 27, 2025. Order Consolidating Cases (Jan. 30, 2025). We reiterated that point in our February 24 order allowing Lu to exceed page limits. Consistent with both orders, Lu's January 27, 2025 brief will be struck from the record and will not be considered.

## II. Analysis of Summary Judgment Decision

### A. Applicable Standards

{¶ 21} Before addressing Lu's claims, we will outline the well-established standards that apply to summary judgment. "The procedure set forth in Ohio Civ.R. 56 is modeled after the federal rule that authorizes summary judgment in appropriate cases." *Byrd v. Smith*, 2006-Ohio-3455, ¶ 10. " 'Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons

opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.' " *Id.* at ¶ 11, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

{¶ 22} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 2005-Ohio-2163, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 23} In considering summary judgment decisions, appellate courts apply a de novo standard of review. *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 15. In this type of review, an appellate court independently reviews evidence without deferring to the trial court's findings. *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30, citing *Wilmington Savs. Fund Soc., FSB v. Salahuddin*, 2020-Ohio-6934, ¶ 20 (10th Dist.). Thus, a reviewing court "examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, *see* Civ.R. 56(C), and determines, as if it were the trial court, whether summary judgment is appropriate." *Id.*, citing *Wilmington* at ¶ 19.

B. Discussion

**{¶ 24}** As noted above, Lu's brief failed to set forth any assignments of error. He also failed to comply with most of the remaining requirements in App.R. 16(A)(1)-(8). Lu's reply brief also fails to discuss assignments of error and suffers from the same defects. Where appellants fail to comply with App.R. 16, App.R. 12(A) allows courts to disregard the assignments of error. *In re Estate of Taylor*, 2024-Ohio-1496, ¶ 17 (2d Dist.). An appellate court may also choose to consider error in the interest of justice, but it need not do so. *Id.* at ¶ 18. In the interest of justice, we will consider Lu's brief to the extent we can decipher his arguments.

**{¶ 25}** As a preliminary point, we note that the brief and reply brief are riddled with accusations of alleged crimes committed by UD and its attorney, Lu's former attorney, the trial court, and Muratore, who was a member of the search committee that evaluated Lu for the CME faculty position. These accusations are unsupported by the record and will be disregarded. The issue is whether the trial court erred in granting summary judgment in UD's favor on Lu's retaliation claim. We also note that much of Lu's brief focuses on matters he has already contested and that were decided adversely to him in the prior federal action against UD. These matters include discrimination in non-renewal of Lu's adjunct contract, failure to hire Lu for a faculty position with the Electro-Optics and Photonics Department, and retaliation for Lu's complaint about racism involving a prior student (Sorrie Ceesay) and filing of civil rights complaints with ODRC in January 2021. *See* Appellant's Brief, p. 3-5 and 7-17.

**{¶ 26}** "The doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel." *O'Nesti v. DeBartolo Realty Corp.*, 2007-Ohio-1102, ¶ 6, citing *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 381 (1995). "Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action. *Id.*, citing *Fort Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.*, 81 Ohio St.3d 392, 395 (1998). "Issue preclusion, on the other hand, serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies. . . . Issue preclusion applies even if the causes of action differ." *Id.* at ¶ 7.

**{¶ 27}** Both UD and Lu were parties to the federal litigation, and even though the cause of action differs here, i.e., it involves a later hiring decision, Lu cannot relitigate the matters that were at issue in the federal action. The relevant issue here is whether UD retaliated against Lu in considering his application for the CME associate professor's position. In this matter, what would be relevant would be whether the search committee members were aware of Lu's prior filings with the OCRC in January 2021, which would have been protected activity under R.C. 4112.02(I), or improperly based their decision on that.[1]

---

[1] While UD's summary judgment motion indicated that Lu had also filed a March 30, 2021 complaint with the OCRC concerning the failure to hire Lu for the Photonics position, Lu's complaint and amended complaint do not refer to this charge or to the Photonics position; the complaints only refer to the January 2021 OCRC filings. *See* UD Summary Judgment Motion, p. 3, citing Ex. 1, ¶ 41 (filed in the federal lawsuit Lu filed against UD, S.D. Ohio Case: 3:22-cv-00092) and Andrew Sarangan Affidavit, ¶ 8. According to the decisions in

**{¶ 28}** In awarding summary judgment to UD, the trial court commented that:

The University advances three arguments in support of its request for judgment as a matter of law on Dr. Lu's retaliation claim: (1) Dr. Lu cannot establish the second element of a prima face case of retaliation, given that the search committee members had no knowledge of Dr. Lu's OCRC charges nor his plagiarism complaint; (2) Dr. Lu cannot establish the fourth element of his prima facie case because there is no causal link between his protected activity and termination; and (3) even assuming Dr. Lu had set forth a prima facie case, the University has demonstrated that the decision not to hire Dr. Lu was based on legitimate, nondiscriminatory reasons, and Dr. Lu has failed to prove that its proffered reasons were merely pretext. Upon review of the evidence submitted by the parties, the Court agrees with the University and finds that there remains no genuine issue of material fact and Dr. Lu cannot establish the second and fourth elements of his prima facie case of retaliation, nor has he proven that the University's proffered reason for not hiring him was merely pretext.

Final and Appealable Decision, Order, and Entry Granting Defendant's Motion for Summary Judgment (Aug. 29, 2024), p. 11.

**{¶ 29}** In finding in UD's favor, the court noted that it found "no direct or

---

the federal case, Lu filed a complaint with the OCRC on March 30, 2021, about UD's failure to hire him for the Photonics job. *See Lu*, 2023 WL 8187299, at *3 (6th Cir. Nov. 27, 2023); *Lu v. Univ. of Dayton*, 651 F.Supp.3d 900 (S.D. Ohio 2023). There were no allegations in the case before us that the CME committee knew about the March 30 filing with the OCRC.

circumstantial evidence that the decisionmakers were aware that Plaintiff had engaged in a protected activity at the time they rejected his application." *Id.* at p. 12. The court also stated, "the evidence further shows that the decisionmakers were not aware of Dr. Lu's plagiarism complaint at the time they evaluated his application." *Id.* at p. 13.

**{¶ 30}** Under R.C. 4112.02(A), it is unlawful for "any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." In addition, R.C. 4112.02(I) does not allow "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." This is known as retaliation.

**{¶ 31}** Retaliation may be proven by either direct or circumstantial evidence. *Little York Tavern v. Lane*, 2017-Ohio-850, ¶ 17 (2d Dist.). However, direct evidence is rare in discrimination cases. *Shepard v. Griffin Servs., Inc.*, 2002-Ohio-2283, *3 (2d Dist. May 10, 2002), citing *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). No direct evidence was presented here.

**{¶ 32}** If no direct evidence of "discriminatory motive" exists, courts apply the "order and allocation of proof" established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). *Williams v. Akron*, 2005-Ohio-6268, ¶ 9. Under the *McDonnell* analysis,

"If a complainant establishes a prima facie case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 14, quoting *McDonnell* at 802. "If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate 'that the proffered reason was not the true reason for the employment decision.' " *Id.*, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

{¶ 33} For purposes of a prima facie case of retaliation, "a claimant must prove that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Id.* at ¶ 13, citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). *See also Little York* at ¶ 18; *Aubrey-Dean v. CareSource*, 2024-Ohio-3209, ¶ 48 (2d Dist.).

{¶ 34} In the case before us, Lu engaged in a protected activity by filing complaints with the OCRC in January 2021, and UD took adverse action (at least on its face) by rejecting Lu for the CME associate professor position. However, as the trial court noted, Lu failed to satisfy the second and fourth prongs of the prima facie test.

{¶ 35} On a superficial level, UD as an entity was obviously aware of the January 2021 OCRC complaints. However, the members of the screening committee for the CME position (other than Kristin Krupa) were not aware. The screening committee was the entity with decision-making authority for the position. The members consisted of Dr. Krupa, the chair of the CME Department, Dennis Buchanan, Division Head of the

Structural Materials Division of the UD Research Institute, Donald Klosterman, Associate Professor in the CME Department, and Christopher Muratore, also Associate Professor in the CME Department. In her role as CME Department chair, Krupa knew of Lu's prior OCRC complaints. However, Krupa purposely did not comment on Dr. Lu's application while it was being reviewed during the initial screening of applicants and did not discuss the charges at any point during the search process. In addition, all the search committee members had an equal say in the decision-making process. They all, including Krupa, limited their consideration to Lu's qualifications as an applicant and whether he met the minimum or preferred qualifications for the position. Krupa Aff., ¶ 1, 3, 5, 9, and 10; Buchanan Aff., ¶ 1, 3, 5, 9, and 10; Klosterman Aff., ¶ 1, 3, 5, 9, and 10; Muratore Aff., ¶ 1, 3, 5, 10, and 11; and Krupa Depo. at 16-23 and 32. Lu failed to present evidence otherwise.

{¶ 36} During her deposition, Krupa described the standard process that search committees use to evaluate applicants. First, the committee members individually review every application. They create a checklist, by which they compare the content in the application with all the minimum and preferred qualifications. The committee then meets to discuss the applications. If candidates do not meet minimum qualifications, they are immediately removed. At that point, the committee discusses the remaining candidates in connection with the preferred qualifications, considering strengths and weaknesses. The purpose of this is to narrow the list to between eight and 12 people who will be interviewed either by phone or by Zoom. After the initial interviews, Human Resources conducts a quality check, and the committee obtains letters of reference from the

references that candidates provide. The committee also checks out listed publications. That was the process used here. Krupa Depo. at 16-23.

**{¶ 37}** According to Krupa, Lu met the minimum qualifications for the position with some constraints. In particular, a minimum requirement was that candidates must summarize prior research and provide a detailed vision of the future. Lu's vision of the future was not very strong and was significantly lacking compared to other candidates, as it lacked detail, ideas, and length. *Id.* at 28. Based on Krupa's checklist, Lu did not make the final list of 10 candidates who would be interviewed. As noted, Krupa did not participate in the discussion about Lu. However, the other three committee members all agreed that Lu was not a strong enough candidate to move forward. Of the 21 candidates who had applied, Lu and 12 others were eliminated in the initial round because they were deemed unqualified or not competitive. *Id.* at 29. *See also* Krupa Aff. at ¶ 6 and 8.

**{¶ 38}** Dr. Muratore was also on the search committee and was an associate professor in the CME Department. Muratore had received a Ph.D. from the Colorado School of Mines in 2002, was a post-doctoral research fellow at the U.S. Naval Research Laboratory in Washington, D.C. for two years, and then became a visiting scientist at the U.S. Air Force Research Laboratory in Dayton until 2009, when he was hired there as a government employee. UD hired him as a research scientist in 2012, and he worked in that position until being hired as an associate professor in 2017. Muratore Depo. at 11-14 and 17.

**{¶ 39}** Muratore's description of the search committee process was consistent with what Krupa described. *Id.* at 33-39, 42, 50-51, 63-64 and 84-85. Like Krupa, Muratore did

not include Lu on his list of candidates who should be interviewed and found Lu's research statement concerning his vision for the future to be very weak. *Id.* at 86-87. However, that was not the only issue. Lu's research activity, i.e., publication, had been low in the previous six to ten years; it was not competitive with other candidates and was significantly different. *Id.* at 88-90. *See also* Ex. 1 attached to Lu's summary judgment response (indicating that prior to the 2021 application, Lu's last publication was in 2014). Publication is an important part of being an associate professor and is a significant factor in evaluating candidates.  Muratore Depo. at 21 and 34. Again, Lu offered no evidence disputing these points.

{¶ 40} The plagiarism charge is irrelevant here. The job description for the CME position was posted on March 5, 2021, and the posting closed on April 30, 2021.  The committee concluded an initial review of the 21 applicants on May 20; at that time, it eliminated Lu and 12 other applicants who failed to meet minimum qualifications or were uncompetitive. Krupa then offered the job to Dr. Li Cao on July 9. Cao accepted and began working in that position on August 16, 2021. Krupa Aff. at ¶ 4, 6, 8, and 12.

{¶ 41} The first notice UD had of Lu's plagiarism complaint was on July 20, 2021, when it received a letter from Lu, who alleged that Muratore had plagiarized his research. Candise Powell Aff., ¶ 2 and 3. In this letter, Lu admitted that UD had not previously known of this alleged misconduct. Specifically, Lu stated that:

> The evidence of plagiarism, unethical research conduct was submitted to the Ohio Civil Right Commission (OCRC) on March 1, 2021 as a part of my rebuttal letter to the Position Statement letter of UD for my

wrongful termination complaint and racism at UD (the OCRC Case Number# 29165). I have assumed that UD have [sic] received the evidence via the OCRC. Since UD did not respond after more than 4 months, I contacted the OCRC on July 14, 2021 and I was told that OCRC did not forward the evidence to UD.

(Emphasis omitted.) Powell Aff. at ¶ 4, quoting Lu's "Complaint of Research Misconduct" letter dated July 19, 2021; *see also* Ex. 23, p. 1 attached to Lu's summary judgment response. Lu failed to present evidence that anyone on the CME search committee knew of the plagiarism allegation when his application was rejected. In fact, Lu's own statement reveals that no one at UD knew.

{¶ 42} Krupa and Interim Dean Margie Pinnell investigated Lu's plagiarism complaint and found it lacked merit. They then created a multi-page report and gave it to Paul Benson, the UD Provost and Executive Vice President of Academic Affairs. As a result, on August 22, 2021, Benson sent a letter to Lu informing him that UD had found his complaint unfounded. Krupa Depo. at 31-33; Powell Aff. at ¶ 6-7 and attached Exs. A and B. Because these facts all occurred after Lu was rejected for the CME position, his plagiarism claim could not possibly have impacted the committee's decision.

{¶ 43} Failure on the second prong alone is fatal to Lu's prima facie case on the retaliation claim. However, for the same reasons, no causal connection was shown between the protected activity and the decision not to hire Lu. "To demonstrate a causal connection between an adverse employment action and the exercise of protected rights, the evidence must show that the employee's engagement in protected activity was a

determinative factor, rather than just a motivating factor, in the employer's decision to take an adverse employment action." *Aubrey-Dean*, 2024-Ohio-320, at ¶ 51, citing *Diller v. Miami Valley Hosp.*, 2017-Ohio-9051, ¶ 46 (2d Dist.), and *Little York*, 2017-Ohio-850, at ¶ 16. Here, there is no evidence that Lu's engagement in protected activity was a factor.

**{¶ 44}** Furthermore, even if Lu had established a prima facie case, UD met its burden of providing legitimate, non-discriminatory reasons for its actions. *See Greer-Burger*, 2007-Ohio-6442, at ¶ 14. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255. As indicated, Lu had deficiencies both in his research statement and publications. Notably, at the point Lu was rejected, several candidates were still in contention for the position, not just the person who was ultimately hired.

**{¶ 45}** The reasons UD offered met the burden of production, and Lu presented no evidence regarding these candidates (other than the one who was ultimately offered the job) or evidence that would cast doubt on UD's proffered reasons. And, as noted, a number of candidates who met the minimum qualifications were rejected and were not interviewed. Muratore Depo. at 90.

**{¶ 46}** Once a defendant meets the burden of production, the plaintiff "now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more

likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine* at 256.

{¶ 47} The crux of Lu's argument is that he was the best candidate and should have been hired for the job. That is his opinion; clearly, the committee did not share it, nor were they required to do so. " '[I]n the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.' " *Silberstein v. Montgomery Cty. Community College Dist.,* 2009-Ohio-6138, ¶ 41 (2d Dist.), quoting *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 627 (6th Cir. 2006).

{¶ 48} The chosen candidate, Dr. Cao, had obtained an M.S. in 2002 and a Ph.D. in 2005 from the Chinese Academy of Sciences in Beijing, China. In addition, he obtained an M.S. in Materials Engineering in 2020 from UD. Cao also had considerable teaching and research experience, including as a research associate at Clemson University; a research scientist from 2012 to 2015 in the UD CME Department; a research engineer in the UD CME Department from 2015 to 2018; and a research professor at the UD CME Department from 2018 to the date of the 2021 application. Cao had also taught undergraduate and graduate classes at UD from 2016 to the date of his application, had mentored graduate students from 2012 to that time, and had 90 publications listed on his

resume. These included three then in preparation, one in revision in 2021 for a publication called *Materials Letters*, and another article that had been published in 2021. *See* Lu Ex. 20 (filed under seal).

**{¶ 49}** There was no indication that Cao lacked either the minimum or preferred qualifications for the position, and Muratore stated that he was impressed by the high impact of Cao's publications, which had been cited by thousands of people. Muratore Depo. at 75-77. In fact, using Google Scholar and a hyperlink for UD, Muratore found that Cao was among the top three or at least the top five cited persons who were affiliated with UD. *Id.*

**{¶ 50}** Lu failed to present evidence on this point other than his belief that he should have been chosen for the job. However, "plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988). *Accord Senu-Oke v. Bd. of Edn. of Dayton City School Dist.*, 2005-Ohio-5239, ¶ 31 (2d Dist.). Because "courts are not free to second-guess an employer's business judgment," a party's assertion that he or she is equally or more qualified than a chosen candidate is insufficient to support a finding of pretext. Instead, the decisionmaker's perception is the relevant factor, not the applicant's perception of herself. *Branson* at 772.

**{¶ 51}** Lu was "an experienced physics teacher" and "taught introductory physics classes as an adjunct professor at the University of Dayton" from 2014 to 2020. *Lu*, 2023 WL 8187299, at *1. Like Cao, Lu had a Ph.D. (as did all candidates who met the minimum requirements). Lu had also previously been an associate professor at Fisk University from

2004 to 2010 and had received tenure there in 2009. Lu Ex. 1 (Lu Resume), p. 1 and 6. However, there is no dispute that prior to the 2021 application, Lu's most recent publication had occurred in 2014. *Id.* at p. 11-12. Thus, while Lu perceived himself to be equally or more qualified, this was merely his own opinion. We also note that Lu and Cao were both Chinese immigrants. *See* Ex. 20 and Lu Ex. 1. While Lu is not challenging the hiring decision based on national origin discrimination (nor could he, since both candidates were in the same protected class), UD's choice to hire Cao is inconsistent with Lu's persistent claim that UD is a racist institution. No evidence supports that assertion.

{¶ 52} Accordingly, and based on the preceding discussion, the trial court did not err in granting summary judgment to UD.

### III. Denial of Motion for Relief from Judgment

{¶ 53} As noted, Lu's brief and reply brief failed to comply with App.R. 16(A) and were filled with accusations against UD, involved attorneys, and the trial court. As before, we will not consider those matters. The issue here is whether the trial court erred in denying Lu's motion for relief from judgment. We begin by outlining the appropriate standard for such motions.

### A. Civ.R. 60(B) Standards

{¶ 54} Under Civ.R. 60(B), "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding

for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Civ.R. 59(B); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the judgment."

{¶ 55} "To prevail on a motion brought under Civ.R. 60(B), the movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5); and (3) the motion is made within a reasonable time, and, where the grounds of relief are Civ.R. 60(B)(1), (2) or (3), not more than one year after the judgment, order or proceeding was entered or taken." *GTE Automatic Elec., Inc. v. ARC Industries, Inc.*, 47 Ohio St.2d 146 (1976), paragraph two of the syllabus. However, "[t]hese requirements are independent and in the conjunctive; thus the test is not fulfilled if any one of the requirements is not met.*" Strack v. Pelton*, 70 Ohio St.3d 172, 174 (1994), citing *GTE* at 151.

{¶ 56} "A 'meritorious defense' means a defense 'going to the merits, substance, or essentials of the case.' " *Wayne Mut. Ins. Co. v. Marlow*, 1998 WL 288912, *2 (2d Dist. Jun. 5, 1998), quoting *Black's Law Dictionary* (6th Ed.Rev.1991). The movant has the burden of demonstrating that "the interests of justice demand the setting aside of a

judgment normally accorded finality." *Rose Chevrolet, Inc. v. Adams*, 36 Ohio St.3d 17, 21 (1988). "Relief from a final judgment should not be granted unless the party seeking such relief makes at least a prima facie showing that the ends of justice will be better served by setting the judgment aside." *Id*. "Broad, conclusory statements do not satisfy the requirement that a Civ.R. 60(B) motion must be supported by operative facts that would warrant relief from judgment." (Citations omitted.) *GMAC Mtge., L.L.C. v. Herring*, 2010-Ohio-3650, ¶ 32 (2d Dist.).

{¶ 57} Appellate review in this situation is for abuse of discretion. *Id*. This term "has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). Most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id*. The court stressed in *AAAA Ents.* that "[a] decision is unreasonable if there is no sound reasoning process that would support that decision." *Id*.

{¶ 58} With these standards in mind, we will consider the trial court's decision.

B. Discussion

{¶ 59} On October 11, 2024, Lu filed a motion for relief from judgment accompanied by about 431 pages of exhibits (for a total of 446 pages). The motion did not cite a particular ground in Civ.60(B), but from the discussion, it appears to have been based on Civ.R. 60(B)(2) (newly discovered evidence) and/or 60(B)(3) (an adverse

party's fraud, misrepresentation, or other misconduct). Specifically, Lu alleged that Krupa and Muratore had committed perjury during their January 8, 2024 depositions, that UD had misled the court during its summary judgment motion, and that he had "new" evidence relating to UD's treatment of Sorrie Ceesay, which was attached as Ex. 2. *See* Motion for Relief from Final and Appealable Decision, Order, and Entry Granting Defendant's Motion for Summary Judgment (Oct. 11, 2024) ("Relief Motion"), p. 2, 6, 9, and 13-14.

{¶ 60} In denying Lu's motion, the trial court found that Lu failed to establish the first and second prongs of the GTE test. Final and Appealable Decision, Order, and Entry Denying Defendant's Motion for Relief from Judgment (Dec. 30, 2024) ("Relief Decision"), p. 9. Specifically, the court found: (1) Lu failed to cite any particular provision in Civ.R. 60(B); (2) even if the court assumed Lu referred to subsections (B)(2) and (3), any evidence the court previously did not consider was evidence Lu could have found by due diligence; (3) the new evidence was immaterial and merely cumulative; (4) Lu failed to allege operative facts supporting his fraud claim; (5) Lu failed to provide evidence of a meritorious defense but instead simply recounted speculation; (6) Lu failed to show UD's reason for not hiring him was a pretext; and (7) the evidence of record showed Lu was fairly eliminated as a candidate. *Id.* at 9-10.

{¶ 61} Before we address the decision's merits, we will briefly discuss the claim in Lu's brief about a protective order entered in the trial court. *See* Appellant's Brief, p. 6 and 26-33. While Lu's arguments are not entirely clear, he appears to contend his attorney improperly entered into a protective order without his consent and that it was done to prevent Muratore's alleged crimes (obstruction and perjury under oath) from being

reported to authorities. Lu also alleges various unethical actions on the trial court's part, presumably in entering the protective order. Lu further argues these matters show that racism occurred in the trial court. We disagree. There is no evidence of racist or unethical conduct.

{¶ 62} When Lu responded to UD's summary judgment motion on January 29, 2024, he asked the court for an order allowing him to exceed page limitations for his brief and for an order letting him file Exhibit 20 of his response under seal. Before the court ruled on these motions, UD filed a reply memorandum in support of summary judgment on February 12, 2024. The following day, the parties filed a stipulated protective order, permitting them to designate items as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER." Stipulated Protected Order (Feb. 13, 2024), p. 1. On that day, the court granted Lu's pending motions and also ordered that public access to Exhibit 20 would be restricted. *See* Order and Entry Granting Plaintiff's Motion to Exceed Page Limitation and to File Exhibit 20 Under Seal; Order Restricting Public/Direct Access to Exhibit 20 ("Seal Order") (Feb. 13, 2024).

{¶ 63} The only content in Exhibit 20 is the application that Dr. Cao submitted to UD when he applied for the CME associate professor position. As indicated, Cao was the person selected for that job. The application includes items like Cao's educational background and his curriculum vitae as of April 19, 2021. None of this information has anything to do with Muratore or Krupa.

{¶ 64} On January 29, 2024 (the day Lu filed his summary judgment response),

Lu's attorney also filed a notice of filing deposition transcripts. These transcripts (of the depositions of Krupa and Muratore) were filed before the court granted Lu's motion for a protective order. In reviewing the online docket, we found that they are not currently available for public access on the clerk of court's website. They were, however, available to the trial court (which cited them), and we have reviewed them as well. Despite Lu's claims, there is nothing inappropriate in restricting public access to certain documents. Parties routinely use protective orders to protect the privacy of their own materials. Furthermore, Lu himself filed the complete depositions of both Muratore and Krupa as attachments to his motion for relief from judgment. *See* Relief Motion, Appx. 1 and Appx. 32. Therefore, these documents are part of the public record, and no one has prevented access.

{¶ 65} More importantly, Lu's argument that the attorneys, UD, and the trial court attempted to conceal evidence of perjury and fraud ignores the fact that Lu himself had copies of these documents and could have used them in any way he wished. In fact, Lu stated in his motion that he had reported the alleged "crimes" to law enforcement on July 23 and July 29, 2024. Relief Motion at p. 1 and 3; Ex. 1 attached to the Relief Motion.

{¶ 66} According to Ex. 1 (which is 28 pages long), Lu apparently sent Ex. 1 and its 33 appendices to the trial court, the Assistant U.S. Attorney, and the Montgomery County, Ohio Prosecutor on July 27, 2024. He also copied his own attorney. Notably, Ex. 1 makes essentially the same arguments that Lu used to support his motion for relief from judgment. The rest of Ex. 1 (which is longer) covers irrelevant matters that Lu alleged during the prior federal litigation and here, such as non-renewal of Lu's adjunct teaching

contract, discrimination against Ceesay, and Muratore's alleged plagiarism.

**{¶ 67}** Lu also does not demonstrate why Ex. 20 and the depositions would be of interest to anyone other than the parties to this case. Again, if the public wants to access the depositions, they are available on the clerk's website. As a final point, we note that Lu claimed in the trial court that he did not discover the protective order until August 2024. *See* Lu Reply in Support of Relief from Judgment (Dec. 2, 2024), p. 4. However, the protective order was filed in mid-February 2024, months before the court rendered summary judgment. Lu could have accessed the clerk's website at any time and could have found the order.

**{¶ 68}** Turning now to the decision on Lu's motion for relief from judgment, courts have held that "[t]o the extent that the language of Civ.R. 60(B)(2) provides for a new trial on the basis of newly discovered evidence which could not have been timely obtained, this section does not appear to be a ground for relief from judgment when the original entry is one granting summary judgment." *Thompson v. Russ-Pol, Inc.*, 1989 WL 42973, *3 (11th Dist. Apr. 28, 1989). On the other hand, where summary judgment is involved, courts have chosen to address the matter anyway. *Elliott v. Bobb*, 2024-Ohio-3095, ¶ 46 (4th Dist.), citing *Healey v. Goodyear Tire & Rubber Co.*, 2012-Ohio-2170, ¶ 10 (9th Dist.). We have also done so. *See Jackson v. Am. Lubricant Co.*, 2001 WL 221661, *1 (2d Dist. Mar. 2, 2001). Consequently, we will consider the motion, beginning with the application of Civ.R. 60(B)(2).

C. Newly Discovered Evidence

**{¶ 69}** "To receive relief under Civ.R. 60(B)(2), the moving party must prove: (1) the evidence is actually newly discovered, (2) the moving party exercised due diligence, and (3) the evidence is material, not merely impeaching or cumulative, and a new trial would probably produce a different result." *Dublin v. RiverPark Group, LLC*, 2022-Ohio-1294, ¶ 15 (10th Dist.), citing *McBroom v. Bob-Boyd Lincoln Mercury, Inc.*, 2013-Ohio-1679, ¶ 11 (10th Dist.). *See also Ping v. Payne*, 1999 WL 1267023, *2 (2d Dist. Dec. 30, 1999). "For evidence to be newly discovered, the moving party must establish that it could not have discovered the evidence with due diligence at the time of the trial." *Dublin* at ¶ 16.

**{¶ 70}** Having reviewed all the documents attached to Lu's motion, we conclude that the evidence was not actually newly discovered and could have been found with due diligence. In his memorandum, Lu noted that Muratore's and Krupa's depositions were conducted on January 8, 2024. According to the transcripts, Lu was present for both depositions. Lu also said that he reported his "new evidence" to the trial court on July 24, 2024. Relief Motion at p. 1. He further said he discovered the evidence by opening every storage box that he had after Muratore's deposition. *Id.* at p. 2. Lu did not specify exactly when he looked through the boxes. However, this evidence was clearly not new, since it was in Lu's possession. Lu was also alerted to it in January 2024 – months before the trial court granted summary judgment.

**{¶ 71}** More importantly, the matters Lu submitted are not material or relevant, as his argument primarily relates to events that occurred many years ago in connection with UD contracts with AFRL, non-renewal of Lu's adjunct teaching job, allegations of

discrimination against Ceesay by UD and AFRL, and alleged plagiarism by Muratore. *Id.* at p. 3-15. In addition, Lu raises the alleged illegal actions of UD and Muratore in connection with contacts with DAGSI. *Id.* at 8-9. This is all irrelevant to Lu's claims.

{¶ 72} We have reviewed all 33 appendices attached to Lu's motion and agree with the trial court's conclusions. One example of an irrelevant item is Appx. 33, which is a 2013 contract between UD and DSAGI. *See* Relief Motion at p. 3 (where Lu claims this is "new evidence").

{¶ 73} As indicated in the prior federal litigation, "Ceesay's Ph. D. research was funded through the Defense Associated Graduate Student Innovators program ("DAGSI"). . . DAGSI is an Ohio program funded by the Ohio Department of Higher Education and the United States Air Force that supports science and engineering graduate students and faculty who conduct research in areas targeted by the Air Force Research Laboratory ('AFRL') at Wright Patterson Air Force Base." *Lu*, 651 F.Supp.3d at 905. This contract would have been in effect during the time Lu worked with Ceesay. *Id.* However, that matter is not relevant here. There was no evidence that the CME committee considered Lu's complaints about discrimination against Ceesay when it reviewed Lu's application.

{¶ 74} Another example is Appx. 27, which is the UD "Policy on Misconduct in Research and Scholarship." This policy was first effective in March 1984 and was approved as amended on January 8, 2018. *Id.* at p. 2. Lu failed to provide any reason why this document was actually new and could not have been located with due diligence. Clearly, it could have been located with any diligence, since the policy had existed since

1984.

{¶ 75} " 'Due diligence' is defined as 'such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.' " *Delong v. Springfield Newspaper, Inc.*, 1996 WL 562772, *9 (2d Dist. Sept. 27, 1996), quoting *Black's Law Dictionary* (6 Ed.Rev.1990). Lu was required to present evidence that he acted with due diligence concerning Appx. 27 and to indicate how the document satisfied Civ.R. 60(B)(2) requirements. However, he failed to do so. This is true of all the documents alleged to be "new" evidence.

{¶ 76} While Lu represented himself pro se, "it is well established that pro se litigants are presumed to have knowledge of the law and legal procedures and that they are held to the same standard as litigants who are represented by counsel." *State ex rel. Fuller v. Mengel*, 2003-Ohio-6448, ¶ 10, quoting *Sabouri v. Ohio Dept. of Job & Family Servs.*, 145 Ohio App.3d 651, 654 (10th Dist.), *overruled in part on other grounds by Weidman v. Hildebrant*, 2024-Ohio-2931, ¶ 17.

{¶ 77} Based on the preceding discussion, the trial court did not abuse its discretion concerning the claim for relief under Civ.R. 60(B)(2). The next issue concerns Civ.R. 60(B)(3).

D. Alleged Fraud

{¶ 78} In rejecting Lu's claim for relief under Civ.R. 60(B)(3), the court stated that

"Dr. Lu has failed to allege sufficient operative facts to support his general allegations of fraud. Dr. Lu alleges that Dr. Krupa and Mr. Muratore were dishonest when testifying at their depositions, and he further claims that the University's faculty members were generally aware of his complaints of racism. However, Dr. Lu's mere allegation that the University's employees lied in their affidavits and depositions is insufficient to meet his burden under Civ.R. 60(B)(3)." Relief Decision at p. 9-10. The court further held that neither UD nor its employees had engaged in fraud. *Id*. at p. 10.

{¶ 79} "The fraud or misconduct contemplated by Civ.R. 60(B)(3) is fraud or misconduct on the part of the adverse party in obtaining the judgment by preventing the losing party from fully and fairly presenting his defense, not fraud or misconduct which in itself would have amounted to a claim or defense in the case." *Wells Fargo Bank, N.A. v. Brandle,* 2012-Ohio-3492, ¶ 13 (2d Dist.), citing *State Alarm, Inc. v. Riley Indus. Servs.,* 2010-Ohio-900, ¶ 21 (8th Dist.). " 'In determining the existence of fraud of an adverse party for purposes of Civ.R. 60(B), the movant must prove the elements of fraud. . . . In an action for fraud, the plaintiff must prove each of the following elements: (a) a representation, which (b) is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation, and (f) a resulting injury proximately caused by the reliance.' " *Herring*, 2010-Ohio-3650, at ¶ 37, quoting *Hasch v. Hasch*, 2009-Ohio-6377, ¶ 42 (11th Dist.). Ohio courts have held that "[t]he party asserting fraud has the burden of proving it by clear and convincing evidence." *Kell v. Verderber*, 2013-Ohio-4223, ¶ 44 (1st Dist.), citing *US Bank Natl. Assn. v. Marino*, 2012-Ohio-1487, ¶ 15 (5th

Dist.), and *Hardman v. Chiaramonte*, 39 Ohio App.3d 9, 11 (9th Dist. 1987). *See also Natl. Collegiate Student Loan Tr.-1 v. Payne*, 2022-Ohio-2636, ¶ 18 (10th Dist.).

**{¶ 80}** Having reviewed the entire record, we conclude that the trial court did not abuse its discretion. Lu has repeatedly accused UD, Krupa, and particularly Muratore of fraud and racism. However, Lu's accusations are based on conjecture and incorrect assumptions or interpretations of facts. For example, in his appellate brief, Lu focuses on DAGSI program requirements and the allegation that when Muratore received awards from DAGSI from 2014 to 2017, he was not eligible because he was not tenured faculty or on a tenure track. Appellee's Brief at p. 20-22. Therefore, Lu contends Muratore lied during his deposition and committed fraud when he applied for DAGSI contracts.

**{¶ 81}** We have already found Lu's "new" information is irrelevant. Nonetheless, we will briefly comment on this point because it typifies Lu's lack of understanding of the difference between fact and conjecture and of what facts are relevant to his current claims.

**{¶ 82}** During the January 2024 deposition, Lu's attorney questioned Muratore about his education and general employment background. As noted, Muratore received his Ph.D. in 2002, had been a full-time research scientist and engineer at UD from 2012 to 2017, and had been an associate professor at UD since 2017. Muratore Depo. at 7-9, 11-14, and 17. During the research part of Muratore's career, UD asked him to teach classes every semester. He also supervised both undergraduate and graduate students. *Id.* at 13-14, 18, 20, and 31. Before Muratore became an associate professor, Dr. Browning, the CME Department head, assigned him to work with Ceesay, who was a

Ph.D. student, and with Rachel Ray, who replaced Ceesay and was in the process of obtaining M.S. and Ph.D. degrees. DAGSI was the funding source for this work. *Id.* at 94-98. As noted, Lu had worked with Ceesay before Browning assigned Muratore to the project.

{¶ 83} Lu attached the DAGSI Program Information and Requirements to his motion for relief as Appx. 2. Allegedly, this was "new" information and showed that Muratore and UD had committed fraud because Muratore was not qualified to apply for funding. As indicated, this was because Muratore was not tenured or on tenure track.

{¶ 84} Contrary to Lu's claim, Appx. 2 does not restrict grants only to tenured or tenure-track faculty. The provision in question (*including the part Lu has omitted*) states that: "Faculty applicants must be full-time, tenured or tenure-track. . . Senior research faculty may apply provided they work closely with and advise graduate students."  *Id.* at p. 4. Thus, if Muratore fit within that category, he was able to apply; he did not have to be a tenured or tenure-track faculty member. No evidence was presented to indicate that Muratore did not qualify per this definition. According to Muratore's deposition, he was a research engineer and scientist; he also worked with and advised graduate students.

{¶ 85} We also note this paragraph further states that, "No faculty members other than the applicant may receive a stipend or any miscellaneous expense monies from an AFLR/DAGSI award without prior approval by BOTH AFLR and DAGSI." *Id.* The reason for such a provision is obvious, since the program appears to have been primarily intended to benefit students. *Lu*, 651 F.Supp.3d at 905; *Lu*, 2023 WL 8187299, at *1. In any event, Lu never submitted any evidence indicating that Muratore received such a

stipend or expense money. Again, this "new" information was not relevant. As we have repeatedly said, the issue before the trial court was whether UD retaliated against Lu because he had filed complaints with the OCRC in January 2021. There was no evidence of retaliation.

**{¶ 86}** Accordingly, the trial court did not abuse its discretion in finding that relief under Civ.R. 60(B)(3) was unwarranted. In light of the preceding discussion, the second assignment of error is overruled.

**{¶ 87}** As a final point, on May 2, 2025, Lu filed a document with our court entitled, "Certification of Appellant's Efforts to Discover Evidences Concealed by Appellee." However, Lu has already filed a brief and reply brief. Under App.R. 12(C), after the reply brief has been filed, "No further briefs may be filed except with leave of court." Because Lu failed to request leave, this document will be struck from the record and will not be considered.

## IV. Conclusion

**{¶ 88}** Both of Lu's assignments of error having been overruled, the judgments of the trial court are affirmed. In addition, we order the clerk to strike Lu's "Submit Brief of Appeal" filed on Jan 27, 2025 in Case No. 30272. We further order the clerk to strike Lu's "Certification of Appellant's Efforts to Discover Evidences Concealed by Appellee," filed on May 2, 2025, in Case Nos. 30272 and 30375.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.